| | |
|---|---|
| 1. **Mr. Vamsidhar R Vurimindi**<br>313 Arch Street, Unit 607, Philadelphia, PA 19106<br>**Plaintiff,**<br>**Vs.**<br>1. **Fuqua School of Business, Duke University**<br>1 Towerview Drive, Durham, NC 27708-0120 USA<br>2. **Moira Ringo**<br>7730 Cape Charles Dr, Raleigh, NC 27617<br>3. **Douglas M Bashar**<br>7002 Rippling Stone Lane, Raleigh, NC 27612<br>4. **Johnny A Williams**<br>7707 Alexander Promenade Pl, Raleigh, NC 27617<br>5. **Gregory S Valentine**<br>2908 Laura Duncan Road, Cary, NC 27513<br>6. **John H Dohnal**<br>205 Waterford Drive, Clayton, NC 27520<br>7. **Alissandro R Castillo**<br>627 Fern Hill Road, Mooresville, NC 28117<br>8. **Robert E Ross**<br>117 Homegate Circle, Apex, NC 27502<br>9. **Shana Keating**<br>3028 Sawyers Mill Drive, Apex, NC 27539<br>**Defendants .......continued in next page** | **UNITED STATES DISTRICT COURT**<br>**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**<br><br>**Civil Action No. 10-CV-00234-EL**<br><br>**Complaint for Conspiracy to Interfere with Civil Rights**<br>**Complaint for Conspiracy Against Rights of Citizens**<br>**Complaint for Aiding and Abetting**<br>**Complaint for Breach of Contract**<br>**Complaint for Tortious / Wrongful Interference**<br>**Complaint for Slander**<br>**Complaint for Vicarious Liability** |

**N O T I C E**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

You should take this paper to your lawyer at once. If you do not have a lawyer, go to or telephone the office set forth below. This office can provide you with information about hiring a Lawyer. If you cannot afford to hire a lawyer, this office may be able to provide you with information about agencies that may offer legal services to eligible persons at a reduced fee or no fee.

**Philadelphia Bar Association**
Lawyer Referral and Information Services
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

**A V I S O**

USTED HA SIDO DEMANDADO/A EN CORTE. Si usted desea defenderse de las demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta demanda y aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya. Se le advierte de que Si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la corte sin más aviso adicional. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

Usted debe llevar este documento a su abogado inmediatamente. Si usted no tiene un abogado, llame o vaya a la siguiente oficina. Esta oficina puede proveerle informacion a cerca de como conseguir un abogado. Si usted no puede pagar por los servicios de un abogado, es posible que esta oficina le pueda proveer informacion sobre agencias que ofrezcan servicios legales sin cargo o bajo costo a personas que cualifican.

**Associacion de Licenciados de Filadelfia**
Servicio de Referencis e
One Reading Center
Filadelfia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

| | |
|---|---|
| 10. **Sudheer Dharanikota**<br>111 Fieldbrook Ct ,Cary, NC 27519<br>11. **Sunil Balasaheb Patil**<br>1523 Millhous Drive, Cary, NC 27513<br>12. **Amit Khare**<br>1511 Audubon Parc Dr, Cary, NC 27518<br>13. **David R Mitchell**<br>3649 Warp St, Charlotte, NC 28205<br>14. **Kristoffer S Singleton**<br>502 Oxfordshire Lane, Chapel Hill, NC 27517<br>15. **Peter M Walton**<br>1299 Sandy Bottom Drive, NW Concord, NC 28027<br>16. **Eugene White**<br>130 Stillwater Road, Windsor, SC 29856<br>17. **Rajiv Prasad Kolagani**<br>2220 Mindy Ln, Cumming, GA 30041<br>18. **Pratibhash Chattopadhyay**<br>7729 F Oakhill Road, North Royalton, OH 44133<br>19. **Jennifer E. Erickson**<br>1914 W. 36th Street, Austin, TX 78731<br>20. **Seth M. Gillespie**<br>4390 King Street, Apt # 1106 Alexandria, VA 22302<br>**Defendants .......continued in next page** | **UNITED STATES DISTRICT COURT**<br>**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**<br><br>**Civil Action No. 10-CV-00234-EL** |

**N O T I C E**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

You should take this paper to your lawyer at once. If you do not have a lawyer, go to or telephone the office set forth below. This office can provide you with information about hiring a Lawyer. If you cannot afford to hire a lawyer, this office may be able to provide you with information about agencies that may offer legal services to eligible persons at a reduced fee or no fee.

**Philadelphia Bar Association**
Lawyer Referral and Information Services
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

**A V I S O**

USTED HA SIDO DEMANDADO/A EN CORTE. Si usted desea defenderse de las demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta demanda y aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya. Se le advierte de que

Si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la corte sin más aviso adicional. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

Usted debe llevar este documento a su abogado inmediatamente. Si usted no tiene un abogado, llame o vaya a la siguiente oficina. Esta oficina puede proveerle informacion a cerca de como conseguir un abogado. Si usted no puede pagar por los servicios de un abogado, es posible que esta oficina le pueda proveer informacion sobre agencias que ofrezcan servicios legales sin cargo o bajo costo a personas que cualifican.

**Associacion de Licenciados de Filadelfia**
Servicio de Referencis e
One Reading Center
Filadelfia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

21. **Jason C. Link**
    1304 Greenway Rd. Wilmington, DE 19803
22. **Jason S Sundberg**
    211 Delmont Ave, Ardmore, PA 19003
23. **Pradeep Rajagopal**
    12317 Amoretto Way, Raleigh, NC 27613
24. **WL Gore & Associates**
    555 Paper Mill Rd, Newark, DE 19711
25. **MD Laser Studio**
    538 Iliamson Road, Mooresville, NC 28117
26. **Ferro Corporation,**
    1000 Lakeside Avenue, Cleveland, Ohio 44114-7000
27. **Alcatel-Lucent**
    2600-700 Mountain Avenue, Murray Hill, NJ 07974
28. **Talecris Biotherapeutics, Inc.**
    4101 Research Commons, 79 T.W. Alexander Drive RTP, NC 27709
29. **Dell Inc**
    One Dell Way, Round Rock, TX 78682
30. **Booz Allen Hamilton**
    8283 Greensboro Drive, McLean, VA 22102
31. **Health Port**
    120 Bluegrass Valley Parkway, Alpharetta, GA 30005
    **Defendants .......continued in next page**

)))))))))))))))))))))))))))))))))

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**Civil Action No. 10-CV-00234-EL**

---

**N O T I C E**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

You should take this paper to your lawyer at once. If you do not have a lawyer, go to or telephone the office set forth below. This office can provide you with information about hiring a Lawyer. If you cannot afford to hire a lawyer, this office may be able to provide you with information about agencies that may offer legal services to eligible persons at a reduced fee or no fee.

**Philadelphia Bar Association**
Lawyer Referral and Information Services
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

**A V I S O**

USTED HA SIDO DEMANDADO/A EN CORTE. Si usted desea defenderse de las demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta demanda y aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya. Se le advierte de que
Si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la corte sin más aviso adicional. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

Usted debe llevar este documento a su abogado inmediatamente. Si usted no tiene un abogado, llame o vaya a la siguiente oficina. Esta oficina puede proveerle informacion a cerca de como conseguir un abogado. Si usted no puede pagar por los servicios de un abogado, es posible que esta oficina le pueda proveer informacion sobre agencias que ofrezcan servicios legales sin cargo o bajo costo a personas que cualifican.

**Associacion de Licenciados de Filadelfia**
Servicio de Referencis e
One Reading Center
Filadelfia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

| | |
|---|---|
| **32. Amgen Inc**<br>One Amgen Center Drive, Thousand Oaks, CA 91320<br>**33. Agilent Technologies**<br>25301 Stevens Creek Blvd, Santa Clara CA 95051<br>**34. Bank of America**<br>100 N. Tryon Street, Charlotte, NC 28262<br>**35. Ericsson Inc**<br>86300 Legacy Drive, Plano, TX 75024<br>**36. GlaxoSmithKline**<br>One Franklin Plaza, 200 N. 16th Street, Philadelphia, PA 19102<br>**37. Signalscape, Inc**<br>200 Regency Forest Drive Suite 310, Cary, NC 27518<br>**38. Emergent Game Technologies**<br>5016 N. Parkway Calabasas, Suite 210 Calabasas, CA 91302<br>**39. Accenture, LLP**<br>1345 Avenue of the Americas, New York, NY 10105<br>**40. Seegrid Corporation**<br>216 RIDC Park West Drive ,Pittsburgh, PA 15275<br><br>**Defendants .......continued in next page** | **UNITED STATES DISTRICT COURT**<br>**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**<br><br>**Civil Action No. 10-CV-00234-EL** |

| **N O T I C E** | **A V I S O** |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.<br><br>You should take this paper to your lawyer at once. If you do not have a lawyer, go to or telephone the office set forth below. This office can provide you with information about hiring a Lawyer. If you cannot afford to hire a lawyer, this office may be able to provide you with information about agencies that may offer legal services to eligible persons at a reduced fee or no fee.<br><br>**Philadelphia Bar Association**<br>Lawyer Referral and Information Services<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 | USTED HA SIDO DEMANDADO/A EN CORTE. Si usted desea defenderse de la demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta demanda y aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya. Se le advierte de que<br>Si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la corte sin más aviso adicional. Usted puede perder dinero o propiedad u otros derechos importantes para usted.<br><br>Usted debe llevar este documento a su abogado inmediatamente. Si usted no tiene un abogado, llame o vaya a la siguiente oficina. Esta oficina puede proveerle informacion a cerca de como conseguir un abogado. Si usted no puede pagar por los servicios de un abogado, es posible que esta oficina le pueda proveer informacion sobre agencias que ofrezcan servicios legales sin cargo o bajo costo a personas que cualifican.<br><br>**Associacion de Licenciados de Filadelfia**<br>Servicio de Referencis e<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 |

41. **SunTrust Bank, Inc**
303 Peachtree St. NE Atlanta, GA 30308
42. **Smith Barney**
1585 Broadway, New York, NY 10036
43. **Shaw Areva Mox Services** C/o. The Shaw
Group Inc
4171 Essen Lane, Baton Rouge, Louisiana 70809

**Defendants**
_____

)
)
)
)
)
)
)
)
)
)
)
)

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**Civil Action No. 10-CV-00234-EL**

---

**N O T I C E**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

You should take this paper to your lawyer at once. If you do not have a lawyer, go to or telephone the office set forth below. This office can provide you with information about hiring a Lawyer. If you cannot afford to hire a lawyer, this office may be able to provide you with information about agencies that may offer legal services to eligible persons at a reduced fee or no fee.

**Philadelphia Bar Association**
Lawyer Referral and Information Services
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

**A V I S O**

USTED HA SIDO DEMANDADO/A EN CORTE. Si usted desea defenderse de las demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta demanda y aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya. Se le advierte de que Si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la corte sin más aviso adicional. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

Usted debe llevar este documento a su abogado inmediatamente. Si usted no tiene un abogado, llame o vaya a la siguiente oficina. Esta oficina puede proveerle informacion a cerca de como conseguir un abogado. Si usted no puede pagar por los servicios de un abogado, es posible que esta oficina le pueda proveer informacion sobre agencias que ofrezcan servicios legales sin cargo o bajo costo a personas que cualifican.

**Associacion  de Licenciados de Filadelfia**
Servicio de Referencis e
One Reading Center
Filadelfia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

**(I)**   <u>**AMENDED COMPLAINT:**</u>

01.   **Plaintiff**, Vamsidhar R Vurimindi sues **Defendants**   Fuqua School of Business, Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Shana Keating, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,   Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, David R Mitchell, Pradeep Rajagopal,   WL Gore & Associates, MD Laser Studio, Ferro Corporation, Alcatel-Lucent, Talecris Biotherapeutics,  Inc, Dell Inc, Booz Allen Hamilton, Health Port,  Amgen  Inc,  Agilent  Technologies,  Bank  of  America,  Ericsson  Inc, GlaxoSmithKline, Signalscape,  Inc, Emergent Game Technologies, Accenture, Seegrid Corporation, SunTrust Bank,  Inc, Smith Barney, and Shaw Areva Mox Services C/o. The Shaw Group Inc and in support states as follows:

**(II)**   <u>**THE PARTIES:**</u>

02.   **Defendant** Fuqua School of Business located at 1 Towerview Drive, Durham, NC 27708-0120 USA. Fuqua School of Business is one of the leading business schools in the world offer various business courses and part of the Duke University in Durham, North Carolina. Duke University is a federal contractor and recipient of federal funds. Hence, Duke University is subjected to laws and regulations set forth by the federal government to address discrimination in employment decisions on the basis of race, color, religion, sex, or national origin, but not limited to the Age Discrimination in Employment Act of 1967 and 1975; Americans with Disabilities Act of 1990 and 2008 ; Civil Rights Act of 1964  and 1991; Equal Pay Act of 1963; Executive Order 11246; Rehabilitation Act of 1973, Section 503 as amended (29 U.S.C. 793);  Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA, 38 U.S.C. §§ 4301 – 4335); Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA).

03.    **Defendant** Douglas M Bashar is a resident of 7002 Rippling Stone Lane, Raleigh, NC 27612. **Defendant** Douglas M Bashar is an employee of **Defendant** WL Gore & Associates**. Defendant** Douglas M Bashar is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Douglas M Bashar slander the **Plaintiff**.

04.    **Defendant**  Alissandro R Castillo is a resident of 627 Fern Hill Road, Mooresville, NC 28117. **Defendant** Alissandro R Castillo  is an employee of **Defendant** MD Laser Studio**. Defendant** Alissandro R Castillo   is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Alissandro R Castillo slander the **Plaintiff**.

05.    **Defendant**  David R Mitchell is a resident of 3649 Warp St, Charlotte, NC 28205. **Defendant** David R Mitchell is an employee of **Defendant** Bank of America. **Defendant** David R Mitchell is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** David R Mitchell slander the **Plaintiff**.

06.    **Defendant**  Pradeep Rajagopal is a resident of 12317 Amoretto Way, Raleigh, NC 27613. **Defendant** Pradeep Rajagopal is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Pradeep Rajagopal slander the **Plaintiff**.

07.    **Defendant**  Shana Keating is a resident of 3028 Sawyers Mill Drive, Apex, NC 27539. **Defendant** Shana Keating is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Shana Keating slander the **Plaintiff**.

08.	**Defendant**  Pratibhash Chattopadhyay  is a resident of 7729 F Oakhill Road, North Royalton, OH 44133. **Defendant** Pratibhash Chattopadhyay is an employee of **Defendant** Ferro Corporation. **Defendant** Pratibhash Chattopadhyay  is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Pratibhash Chattopadhyay  slander the **Plaintiff**.

09.	**Defendant**  Sudheer Dharanikota is a resident of 111 Fieldbrook Ct ,Cary, NC 27519. **Defendant** Sudheer Dharanikota is an employee of **Defendant** Alcatel-Lucent. **Defendant** Sudheer Dharanikota is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**.  **Defendant** Sudheer Dharanikota  slander the **Plaintiff**.

10.	**Defendant**  John H Dohnal is a resident of 205 Waterford Drive, Clayton, NC 27520. **Defendant** John H Dohnal is an employee of **Defendant** Talecris Biotherapeutics, Inc. **Defendant** John H Dohnal is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**.  **Defendant** John H Dohnal slander the **Plaintiff**.

11.	**Defendant** Jennifer E. Erickson is a resident of 1914 W. 36th Street, Austin, TX 78731. **Defendant** Jennifer E. Erickson is an employee of **Defendant** Dell Inc. **Defendant** Jennifer E. Erickson is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Jennifer E. Erickson slander the **Plaintiff**.

12.	**Defendant** Seth M. Gillespie is a resident of 4390 King Street, Apt # 1106 Alexandria, VA 22302. **Defendant** Seth M. Gillespie is an employee of **Defendant** Booz Allen Hamilton. **Defendant** Seth M. Gillespie is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Seth M. Gillespie slander the **Plaintiff**.

13. **Defendant** Rajiv Prasad Kolagani is a resident of 220 Mindy Ln, Cumming, GA 30041. **Defendant** Rajiv Prasad Kolagani is an employee of **Defendant** Health Port. **Defendant** Rajiv Prasad Kolagani is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Rajiv Prasad Kolagani slander the **Plaintiff**.

14. **Defendant** Amit Khare is a resident of 1511 Audubon Parc Dr, Cary, NC 27518. **Defendant** Amit Khare is an employee of **Defendant** Amgen Inc. **Defendant** Amit Khare is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Amit Khare slander the **Plaintiff**.

15. **Defendant** Jason C. Link is a resident of 1304 Greenway Rd. Wilmington, DE 19803. **Defendant** Jason C. Link is an employee of **Defendant** Agilent Technologies. **Defendant** Jason C. Link is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Jason C. Link slander the **Plaintiff**.

16. **Defendant** Sunil Balasaheb Patil is a resident of 1523 Millhous Drive, Cary, NC 27513. **Defendant** Sunil Balasaheb Patil is an employee of **Defendant** Ericsson Inc. **Defendant** Sunil Balasaheb Patil is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Sunil Balasaheb Patil slander the **Plaintiff**.

17. **Defendant** Moira Ringo  is a resident of 7730 Cape Charles Dr, Raleigh, NC 27617. **Defendant** Moira Ringo is an employee of **Defendant** GlaxoSmithKline. **Defendant** Moira Ringo  is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Moira Ringo  slander the **Plaintiff**.

18.    **Defendant** Robert E Ross is a resident of 117 Homegate Circle, Apex, NC 27502.
**Defendant** Robert E Ross is an employee of **Defendant** Signalscape, Inc. **Defendant**
Robert E Ross is a student between March 2008 and November 20098 at Fuqua
School of Business along with the **Plaintiff**. **Defendant** Robert E Ross slander the
**Plaintiff**.

19.    **Defendant** Kristoffer S Singleton is a resident of 502 Oxfordshire Lane, Chapel Hill,
NC 27517. **Defendant** Kristoffer S Singleton is an employee of **Defendant** Emergent
Game Technologies. **Defendant** Kristoffer S Singleton is a student between March
2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**.
**Defendant** Kristoffer S Singleton slander the **Plaintiff**.

20.    **Defendant** Jason S Sundberg is a resident of 211 Delmont Ave, Ardmore, PA 19003.
**Defendant** Jason S Sundberg is an employee of **Defendant** Accenture. **Defendant**
Jason S Sundberg is a student between March 2008 and November 20098 at Fuqua
School of Business along with the **Plaintiff**. **Defendant** Jason S Sundberg slander the
**Plaintiff**.

21.    **Defendant** Gregory S Valentine is a resident of 2908 Laura Duncan Road, Cary, NC
27513. **Defendant** Gregory S Valentine is an employee of **Defendant** Seegrid
Corporation. **Defendant** Gregory S Valentine is a student between March 2008 and
November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant**
Gregory S Valentine slander the **Plaintiff**.

22.    **Defendant** Peter M Walton is a resident of 1299 Sandy Bottom Drive, NW Concord,
NC 28027. **Defendant** Peter M Walton is an employee of **Defendant** SunTrust Bank,
Inc. **Defendant** Peter M Walton is a student between March 2008 and November

20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Peter M Walton slander the **Plaintiff**.

23.    **Defendant** Johnny A Williams is a resident of 130 Stillwater Road, Windsor, SC 29856. **Defendant** Johnny A Williams is an employee of **Defendant** Smith Barney. **Defendant** Johnny A Williams is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Johnny A Williams slander the **Plaintiff**.

24.    **Defendant** Eugene White is a resident of 627 Fern Hill Road, Mooresville, NC 28117. **Defendant** Eugene White is an employee of **Defendant** Shaw Areva Mox Services. **Defendant** Eugene White is a student between March 2008 and November 20098 at Fuqua School of Business along with the **Plaintiff**. **Defendant** Eugene White slander the **Plaintiff**.

25.    **Defendant** WL Gore & Associates is located at of 555 Paper Mill Rd, Newark, DE 19711. **Defendant** WL Gore & Associates sponsored the **Defendant** Douglas M Bashar as a student between March 2008 and November 20098 at Fuqua School of Business.

26.    **Defendant** MD Laser Studio is located at of 538 Williamson Road, Mooresville, NC 28117. **Defendant** MD Laser Studio sponsored the **Defendant** Alissandro R Castillo as a student between March 2008 and November 20098 at Fuqua School of Business.

27.    **Defendant** Ferro Corporation is located at of 1000 Lakeside Avenue, Cleveland, Ohio 44114-7000. **Defendant** Ferro Corporation sponsored the **Defendant** Pratibhash Chattopadhyay as a student between March 2008 and November 20098 at Fuqua School of Business.

28.     **Defendant** Alcatel-Lucent is located at of 2600-700 Mountain Avenue, Murray Hill, NJ 07974. **Defendant** Alcatel-Lucent sponsored the **Defendant** Sudheer Dharanikota as a student between March 2008 and November 20098 at Fuqua School of Business.

29.     **Defendant** Talecris Biotherapeutics, Inc is located at of 4101 Research Commons, 79 T.W. Alexander Drive RTP, NC 27709. **Defendant** Talecris Biotherapeutics, Inc sponsored the **Defendant** John H Dohnal as a student between March 2008 and November 20098 at Fuqua School of Business.

30.     **Defendant** Dell Inc is located at of One Dell Way, Round Rock, TX 78682. **Defendant** Dell Inc sponsored the **Defendant** Jennifer E. Erickson as a student between March 2008 and November 20098 at Fuqua School of Business.

31.     **Defendant** Booz Allen Hamilton is located at of 8283 Greensboro Drive, McLean, VA 22102. **Defendant** Booz Allen Hamilton sponsored the **Defendant** Seth M. Gillespie as a student between March 2008 and November 20098 at Fuqua School of Business.

32.     **Defendant** Health Port is located at of 120 Bluegrass Valley Parkway, Alpharetta, GA 30005. **Defendant** Health Port sponsored the **Defendant** Rajiv Prasad Kolagani as a student between March 2008 and November 20098 at Fuqua School of Business.

33.     **Defendant** Amgen Inc is located at of One Amgen Center Drive, Thousand Oaks, CA 91320. **Defendant** Amgen Inc sponsored the **Defendant** Amit Khare as a student between March 2008 and November 20098 at Fuqua School of Business.

34.    **Defendant** Agilent Technologies is located at of 25301 Stevens Creek Blvd, Santa Clara CA 95051. **Defendant** Agilent Technologies sponsored the **Defendant** Jason C. Link as a student between March 2008 and November 20098 at Fuqua School of Business.

35.    **Defendant** Ericsson Inc is located at of 86300 Legacy Drive, Plano, TX 75024. **Defendant** Ericsson Inc sponsored the **Defendant** Sunil Balasaheb Patil as a student between March 2008 and November 20098 at Fuqua School of Business.

36.    **Defendant** GlaxoSmithKline is located at of One Franklin Plaza, 200 N. 16th Street, Philadelphia, PA 19102. **Defendant** GlaxoSmithKline sponsored the **Defendant** Moira Ringo as a student between March 2008 and November 20098 at Fuqua School of Business.

37.    **Defendant** Signalscape, Inc  is located at of 200 Regency Forest Drive Suite 310, Cary, NC 27518. **Defendant** Signalscape, Inc sponsored the **Defendant** Robert E Ross as a student between March 2008 and November 20098 at Fuqua School of Business.

38.    **Defendant** Emergent Game Technologies is located at of 5016 N. Parkway Calabasas, Suite 210 Calabasas, CA 91302. **Defendant** Emergent Game Technologies sponsored the **Defendant** Kristoffer S Singleton as a student between March 2008 and November 20098 at Fuqua School of Business.

39.    **Defendant** Accenture is located at 1345 Avenue of the Americas, New York, NY 10105. **Defendant** Accenture sponsored the **Defendant** Jason S Sundberg as a student between March 2008 and November 20098 at Fuqua School of Business.

40.   **Defendant** Seegrid Corporation is located at 216 RIDC Park West Drive, Pittsburgh, PA 15275. **Defendant** Seegrid Corporation sponsored the **Defendant** Gregory S Valentine as a student between March 2008 and November 20098 at Fuqua School of Business.

41.   **Defendant** SunTrust Bank, Inc is located at 303 Peachtree St. NE Atlanta, GA 30308. **Defendant** SunTrust Bank, Inc sponsored the **Defendant** Peter M Walton as a student between March 2008 and November 20098 at Fuqua School of Business.

42.   **Defendant** Smith Barney  is located at of 1585 Broadway, New York, NY 10036. **Defendant** Smith Barney sponsored the **Defendant** Johnny A Williams as a student between March 2008 and November 20098 at Fuqua School of Business.

43.   **Defendant** Shaw Areva Mox Services is located at 4171 Essen Lane, Baton Rouge, Louisiana 70809. **Defendant** Shaw Areva Mox Services sponsored the **Defendant** Eugene White as a student between March 2008 and November 20098 at Fuqua School of Business.

44.   **Defendant** Bank of America is located at 100 N. Tryon Street, Charlotte, NC 28262. **Defendant** Bank of America sponsored the **Defendant** David R Mitchell as a student between March 2008 and November 20098 at Fuqua School of Business.

45.   **Plaintiff** Mr. Vamsidhar R Vurimindi is a resident of 313 Arch Street, Unit # 607, and Philadelphia, PA 19106. **Hereafter Plaintiff** Vamsidhar R Vurimindi referred as **Plaintiff**.

46.   **Plaintiff** is informed and believes the **Defendants** Fuqua School of Business, Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit

Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Shana Keating, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg, Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, David R Mitchell, Pradeep Rajagopal, WL Gore & Associates, MD Laser Studio, Ferro Corporation, Alcatel-Lucent, Talecris Biotherapeutics, Inc, Dell Inc, Booz Allen Hamilton, Health Port, Amgen Inc, Agilent Technologies, Bank of America, Ericsson Inc, GlaxoSmithKline, Signalscape, Inc, Emergent Game Technologies, Accenture, Seegrid Corporation, SunTrust Bank, Inc, Smith Barney, and Shaw Areva Mox Services C/o. The Shaw Group Inc thereon alleges that at all times herein mentioned, each of the **Defendants** sued herein was the agent and employee of the remaining **Defendants** and was at all times acting within the purpose and scope of such agency and employment.

47. The **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Shana Keating, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg, Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, David R Mitchell, and Pradeep Rajagopal together herein after called as **Student Defendants.**

48. The **Defendants** WL Gore & Associates, MD Laser Studio, Ferro Corporation, Alcatel-Lucent, Talecris Biotherapeutics, Inc, Dell Inc, Booz Allen Hamilton, Health Port, Amgen Inc, Agilent Technologies, Bank of America, Ericsson Inc, GlaxoSmithKline, Signalscape, Inc, Emergent Game Technologies, Accenture, Seegrid Corporation, SunTrust Bank, Inc, Smith Barney, and Shaw Areva Mox Services C/o. The Shaw Group Inc together herein after called as **Corporate Defendants.**

**(III)**   <u>**FACTUAL BACKGROUND:**</u>

49. Between June 2002 and December 2003, Plaintiff worked as a Statistical Programmer for GlaxoSmithKline through ClinForce. As an employee of the ClinForce, Plaintiff worked for GlaxoSmithKline. Due to several personal reasons

Plaintiff' morale was at low ebb and the manager at Phase -1, Biostatistics Department took advantage of the Plaintiff situation and abused the positional power. The manager at GlaxoSmithKline terminated the Plaintiff' contract on 12th December 2003, just before the Christmas holidays, such hat Plaintiff can't find a job with another employer, who can sponsor H1B visa to the Plaintiff. The manager at GlaxoSmithKline make sure that ClinForce revoke Plaintiff' H1B visa on the same day when the GlaxoSmithKline terminated the contract with Plaintiff. However, with great difficulty, Plaintiff was able to find another employer who can sponsor H1B visa. But, Plaintiff has to relocate to the Maclean, VA. Plaintiff, continued the search for an employment in greater Philadelphia area and found an employment opportunity at Wyeth in Collegeville, PA. Between November 2004 and March 2009 Plaintiff worked for Wyeth.

50.   In 2005 Plaintiff founded the Victor Land LLC, a Pennsylvania Corporation, a to develop and sell small commercial buildings and private homes in the underserved neighborhoods of Philadelphia, Pennsylvania. The company was initially funded with money that Plaintiff earned as software consultant and project manager for international projects at insurance and pharmaceutical companies.  Plaintiff, taught himself several programming languages (SAS and SAP software) and worked with major corporations so that I could stay in the US, while Plaintiff built his business in US. Plaintiff wanted to earn an MBA, because in the next five years Plaintiff wanted to accelerate the company growth to include large-scale real estate and urban infrastructure projects.   Further, Plaintiff wanted to form hybrid Real Estate Investment Trusts in the US and Asia that will fund and develop commercial properties. In collaboration with governments Plaintiff will co-promote Special Economic Zone development and develop integrated townships. In order to accomplish Plaintiff' goals Plaintiff need to gain extensive knowledge of the real estate laws & regulations, architecture, construction, marketing and promotion of developed property. Earning an MBA will assist Plaintiff in the above through

education, access to leaders in the industry, and connections to other like minded people. Hence, Plaintiff applied for an admission into an EMBA program at Fuqua School of Business, Duke University. Fuqua School of Business, Duke University informed to the **Plaintiff** that the school administration would provide hundreds of support personnel to make the Weekend MBA students  experience finest during the term of the course. Further, the extracurricular activities would enrich the education and expand Weekend MBA students  network of business contacts.

51.   When Plaintiff working as a consultant for Wyeth between November 2004 and March 2009 to boot strap and researching the investment opportunities for Victor Land LLC, Plaintiff relentlessly tried to advocate to improve the efficiency and adherence to the FDA regulations, Wyeth employees don't want to improve the efficiency and adherence to the FDA regulations. In order to convince the Wyeth employees, Plaintiff wrote several emails to convince the Wyeth senior management about the importance to adherence to the  FDA regulations and improving efficiency, so that the ultimately the cost of the drug will be reduced. However, Wyeth employees was never interested to improve efficiency and adherence to the FDA regulations. As a retaliation to the Plaintiff' relentless effort to convince the senior Wyeth Management to improve the efficiency and adherence to the FDA regulations, several Wyeth employees ganged up against the Plaintiff and started to propagate made-up about the Plaintiff within Wyeth, UPenn' Wharton and Duke' Fuqua School of Business. Further made every attempt to tarnish the Plaintiff's reputation within Wyeth, UPenn' Wharton and Duke' Fuqua School of Business. Further, Wyeth employees illegally monitored the Plaintiff' home and work computers and obtained Plaintiff' private information illegally and add made up stories to the illegally obtained information and spread rumors at Wyeth, UPenn' Wharton and Duke' Fuqua School of Business. Between November 2004 and March 2009, several Wyeth's Biostatistics Department employees joined GlaxoSmithKline and vice versa. Between June 2007 and March 2008, Wyeth's Biostatistics

Department hired Scott Paterson as Sr. Director, who is working as Statistician when Plaintiff work at GlaxoSmithKline. Scott Paterson was a close friend of the manager that caused severe problems to the Plaintiff, when Plaintiff worked for GlaxoSmithKline. Further, Wyeth employees using each other as an anchor to pass several insinuating comments against the Plaintiff and frequently commented about the Fuqua School of Business course material that Plaintiff is working on his home computer. The employees at Wyeth's Biostatistics Department lured the several Defendant students with bogus promises to provide future job opportunities within Wyeth or elsewhere, provided the defendant students cause enough trouble, such that Plaintiff is dismissed from the school. The employees at Wyeth's Biostatistics Department provided false information about Plaintiff' to the defendant students, sufficient to tarnish the image of the Plaintiff in the minds of the other classmates.

52.   **Plaintiff** was a student of Fuqua School of Business, Duke University between March 2008 and November 2009. **Plaintiff** deliberately choose an Weekend MBA program over online format is to have one-on-one in-person direct contact with the student body, because face-to-face meetings are essential to cultivate new relationships in many business interactions. Further, it is always been **Plaintiff**' goal to learn as much as about business as possible, hence **Plaintiff** self financed the cost to complete the program and paid all expenses on his own, but not limited to the school tuition fee, travel expenses and time to attend the classes. **Plaintiff** was happy for an admission into Fuqua School of Business, Duke University, because there is a widespread belief that, Fuqua School of Business, Duke University is a place for learning and cultivating new relationships while respecting students' privacy and rights.  Fuqua School of Business, Duke University offered the Weekend MBA course over a span of 19 months between March 2008 and November 2009 break into six terms. The Weekend MBA Class of 2009 started with an on-campus orientation program to the students for one (1) week and subsequently classes are held on alternating weekends on Fridays and Saturdays in Terms 1 to 6. Fuqua School of Business, Duke

University provided accommodation on Friday nights. At an extra cost Fuqua School of Business provided accommodation on Thursday nights. On Thursday and Friday nights, **Plaintiff** stayed at the R. David Thomas Center, where Fuqua School of Business, Duke University provided  accommodation to the Weekend MBA students. The R. David Thomas Center opened in 1989 as part of Duke University's Fuqua School of Business, the Thomas Center provides state-of-the-art meeting space as well as contemporary accommodations, and modern comforts. R. David Thomas Center is managed by Marriot Corporation. In between the weekend classes, to continue the collaborative interaction between the students and professors, Fuqua School of Business, Duke University provided the following software tools.

    (i)     Obtain Security Patches for Windows & Office

   (ii)     McAfee VirusScan Enterprise

  (iii)     Regress, a statistical regression add-in for Excel for Windows.

  (iv)     Premium Solver add-in for Excel for Windows.

   (v)     CentraOne, a software having capabilities for live, collaborative and asynchronous learning in a virtual setting. This tool is extensively used by the Weekend MBA students  to interact with the student teams as well as weekly office hour chats with Professors.

**FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY DIDN'T  OFFER BUSINESS WRITING COURSE TO THE PLAINTIFF:**

53.    **Plaintiff** contacted Mark Brown, Janet Maceda and Maureen Maguire Lewis to (1) Improve pronunciation (2) Improve  writing skills and requested to point to the right resources within Duke University.  Maureen Maguire Lewis informed to the **Plaintiff** that she is focusing exclusively on teaching professional writing in this semester and suggested the Plaintiff to attend the classes. However, the classes are held during the week days in the Fuqua School of Business campus and Plaintiff can't attend those classes. Janet Maceda informed to the **Plaintiff** that she teach ESL in the Duke

Graduate School, but don't actually teach a class at Fuqua School of Business. Further, Janet Maceda informed that she provide tutoring for students in the Daytime MBA program one-on-one basis, but as far as  WEMBA goes, there is no English support offered. Mark Brown  contacted the **Plaintiff** and suggested to read The Executive Writer by  Edith Poor (Poor, Edith.  /The Executive Writer: A Guide to Managing  Words, Ideas, and People.  /New York: Grove Press, 1992.); For difficult conversations I would recommend the following: Stone, Douglas, Bruce Patton, and Sheila Heen.  /Difficult Conversations:  How to Discuss What Matters Most/. London. Penguin,  1999.;  Ury, William. /Getting Past No: Negotiating Your Way from Confrontation to Negotiation.  In spite, **Plaintiff** enquired about one-on-one tutoring resources to improve pronunciation and writing skills, Fuqua School of Business, Duke University didn't provided the required help. All that Fuqua School of Business, Duke University pointed the Plaintiff to read the books available in the library. The above said communication happened between March 2008 and April 2008.

**FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY DIDN'T   EXTEND HELP TO POSITION PLAINTIFF' BUSINESS:**

54.     **Plaintiff** contacted Mark Miller and informed that, **Plaintiff** is currently working on four multifamily projects in a good neighborhood of City of Philadelphia and all those properties are purchased by **Plaintiff** from the private owners. Further, **Plaintiff** informed to Mark Miller that by the end of this year Plaintiff will complete the projects on hand and move to other projects. Due the speculative nature of the real estate market, the private owners are asking a lot of money for their vacant properties. If **Plaintiff** buy the vacant land from the private owners, **Plaintiff** may not provide good returns Plaintiff' company shareholders. So Plaintiff have identified several hundred properties in and around center of City of Philadelphia and requested the City of Philadelphia to allocate those properties at a market rate determined by the City of Philadelphia. However, **Plaintiff** not able to convince the

City of Philadelphia government to sell those properties to the Plaintiff.   Also Plaintiff have identified another opportunity, to buy all the tax delinquent properties from the City of Philadelphia at a discount rate. But there are some legal challenges to buy the tax lien properties, but if Plaintiff make a workable proposal, it would be a great value to City of Philadelphia and to Plaintiff' company. Further, **Plaintiff** informed to Mark Miller that **Plaintiff** is open for all sorts of arrangements like partnership or shares in the company to Fuqua's students or anyone who is will to join with the Plaintiff in this endeavor. Further, Plaintiff informed to Mark Miller that **Plaintiff** is looking towards the Fuqua School of Business for guidance about how Plaintiff should be proceed further about this. **Mark Miller** responded to **Plaintiff** and informed that **Mark Miller** will probably be of very little assistance in this to **Plaintiff,** since **Mark Miller** know exactly nothing about real estate. However, **Mark Miller** informed to the Plaintiff  that Mark Miller done some follow up and forwarded Plaintiff' note to the CEO of a real estate investment company who has is an adjunct professor at Fuqua School of Business and asked the professor to follow up with Plaintiff, if the professor is interested in learning more about Plaintiff' venture or to forward Plaintiff' contact information to anyone else involved with Duke that the professor thought might be interested in getting involved.  However, the adjunct professor at Fuqua School of Business never contacted the Plaintiff.

55.     Then, **Plaintiff** contacted Mark Brown and informed him that **Plaintiff** is looking towards the Fuqua School of Business for guidance to position Plaintiff' company and requested to point to the any available resources within the university. Mark Brown responded to **Plaintiff** and informed that he heard from Mark Miller that Mark Miller recommended Andrew Widmark to you because he had taught the real estate course at Fuqua. Further, Mark Brown informed that  the school itself is not responsible to give this kind of advice to students, so any arrangement to help you out would have to be between your company and the individual you contracted with to get help. Further, Mark Brown strongly recommend to the Plaintiff to look for

someone who practices real estate law in Philadelphia. Also, suggested to Plaintiff to seek help from someone who is familiar with that market and with the government's track record in that market. But, Plaintiff wanted to contact the Professor Andrew Widmark after Plaintiff took the professor' Real Estate finance class, because Professor become familiar with Plaintiff over the duration of the course and it will be easier to the Professor to favorable look upon the Plaintiff' request and needs. However, Fuqua School of Business did not offer the Real Estate finance class and Plaintiff never get a chance to interact with the Professor Andrew Widmark. The above said communication happened between April 2008 and May 2008.

**SLANDER AGAINST THE PLAINTIFF DURING TERM 1 - FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY DIDN'T  MITIGATE THE PEER PRESSURE AGAINST PLAINTIFF:**

56.    On 12th April 2008, **Plaintiff** contacted the Mark  Brown and requested to provide some advice on how to cope up with the peer pressure. On 15th April 2008, Mark Brown replied to **Plaintiff** and requested the to provide  more specific information on peer pressure. **Plaintiff** explained the slander and pressure excreted by the **Students Defendants** against the **Plaintiff** to Mark  Brown and other Fuqua School of Business, Duke University administration. But, Fuqua School of Business, Duke University did not take any steps to mitigate the pressure excreted by the **Students Defendants** and stop the slander against the **Plaintiff.**

**FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY PROFESSOR TARGETED THE PLAINTIFF AND VIOLATED FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT (FERPA):**

57.    On 15th March 2008, on the first class in the first hour, the Professor for Statistics , Jill Stowe picked the **Plaintiff** and quizzed the **Plaintiff** in front of the class. Further,

Professor Jill Stowe stated that she is using a randomizing tool to pick the student for the quiz. In the second class, Professor Jill Stowe said that the randomizing tool is not working, hence she will call the students. Later, it turn out that Professor Jill Stowe continued to target the **Plaintiff** and incorrectly evaluated the **Plaintiff**' answers and on purpose leaked the **Plaintiff**' marks through the teaching assistants. Further, the teaching assistants placed the **Plaintiff**' evaluated answer sheets in **Plaintiff**'s locker in such way that anyone can easily retract the **Plaintiff**'s answer sheet. Professor Jill Stowe purposefully failed the **Plaintiff** by incorrectly evaluating **Plaintiff**' answer. **Plaintiff** disputed the grade and appealed the grade as per Fuqua School of Business policy and it took about 10 days to correct the grade to LP.

58.     On the last day of the Term 1, Fuqua School of Business mailed the Term 2 course material to Plaintiff residential address by FedEx ground. As soon as Professor Jill Stowe posted Plaintiff' grades as F (Failed), Fuqua School of Business retracted the course material, while the Term 2 course material in transshipment. After, Fuqua School of Business retracted the Term 2 material from the transshipment. Subsequently, Professor Jill Stowe  changed the Plaintiff grade to LP (Low Pass) in the Stats course, which enabled the Plaintiff to continue to the Term 2. After that, Fuqua School of Business resend the Term 2 material by FedEx ground. However, Term 2 course material arrived by FedEx just before the beginning of the Term 2, Class 1. Hence,  **Plaintiff** do not have time to prepare for the Term 2, Class 1. Further, due to **Plaintiff**'s fulltime job, and real-estate business **Plaintiff** could not able to catch up to the speed and experienced the lag throughout the Term 2.

**STUDENTS COMPLAINED AGAINST THE PLAINTIFF IS CARRYING A GUN ON THE CAMPUS:**

59.     On 14th January 2009 John Gallagher and **Plaintiff** spoke each other over telephone. During the telephone conversation John Gallagher asked the **Plaintiff** whether

**Plaintiff** carrying gun on the campus.   **Plaintiff** was shocked for the question and replied that **Plaintiff** never carried a gun on the campus. Further, **Plaintiff** reminded to the John Gallagher that **Plaintiff** travel to the school by flying through the commercial airlines and it is impossible to carry a gun in the **Plaintiff**'s luggage. Further, **Plaintiff** informed to the John Gallagher that Term 3 final examination is on 23rd and 24th January 2009, and just 10 days before the examination someone accusing the **Plaintiff** is carrying a gun is a serious distraction. And whoever complained that  **Plaintiff** is carrying a gun on the campus is a deliberate attempt to create unnecessary stress against the **Plaintiff**.

60.     On 16th January 2009, **Plaintiff** send an email to John Gallagher to recap the conversation that **Plaintiff** and John Gallagher had on 14th January 2009 as follows: "Dear John Gallagher, Thank you for your call and your time, because I felt better after hearing that you cared about what's been happening. It is always been my goal to learn as much as about business as possible and sometimes it seems that not everyone is as interested in business all the time.  It has been surprising to hear such unkind remarks from so many members of the class. Just last week a fellow team member wrote me a very distressing email concerning plagiarism. I am attaching the email and my reply to that email, for your information. It is hard to understand what prompted her to write this type of accusing email, when every one of the team took information from other sources and paraphrased it for the Macro Economics paper. Even more distressing was the fact that my additions about 'New Trade Theory' to the paper were not included at all in the final submission. When asked why this happened, the team member said that he is willing to talk to me after term final examinations. In Mgr Accounting course, for the TMH (Triangle Manufactured Homes) case I spent 2 full days to comprehend TMH business model, through power point diagrams, data entry into excel spread sheet, spread sheet modeling and data analysis. I have provided lot of ideas, thoughts, interpreting theory and documentation of the analysis and none of this was included in the class project.

Often I feel like that the work is just getting hastily done without a full and complete thoughtful examination. This might be because I personally want to learn, examine, and argue every possible point to learn all angles of thought process. It seems not everyone feels the same way. Once again hearing about the derogatory comments made, what are so common now that Brooke, cannot even remember making any such comments. Once you come back, if you have time I have dozen stories of derogatory comments that are made in just, which I never heard joking with others. Things like this are not easily solved, but if you have any suggestions for me that might help me, please let me know. I have enjoyed every professor's classes except Prof. Jill Stowe, who left the school. Class room settings are very good. Selection of the course books and course material containing high value material. The seminar of the Prof. Dan Ariely, author of Predictably Irrational, was very good. Me and my wife both heard his book on tape.  The Ford Library books collection and staff and members are fantastic.  In my recent trip to HSM program Weekend in DC, the two day time students (Lindsey Layer and Regina Myers) that I met were very kind and respectful. Guest lecturers by Jamie Dimon, CEO, JP Morgan, Lars Von Kantzow, President & CEO, Nomacorc are top notch. Lectures given by, Honorable Congressman Bill Gradison, Prof. Dan Mendelson, Prof. Marie Francis Luis and Prof. Kevin Schulman part of HSM program are very insightful. Even my wife who is a COO of a fast growing life sciences company in Philadelphia region said that the work done at is of high value.  For all the amazing positive things happenings that make me happy at Duke, it is unfortunate that my classmates do not seem attracted to intellectual arguments."}

61.   However, Fuqua School of Business administration wanted to investigate the matter further and insisted the Plaintiff to meet with Bill Boulding, Senior Associate Dean, and Mohan Venkatachalam on 23rd and 24th January 2009 to discuss this matter further. On 23rd January 2009, **Plaintiff** had a meeting with Bill Boulding, Senior Associate Dean, and Mohan Venkatachalam.  Bill Boulding asked several questions

about the discussions that **Plaintiff** had with the classmates over the last several weeks before the said complaint and there is nothing that give an idea to any student that **Plaintiff** is carrying a gun on the campus. However, Fuqua School of Business administration harassed the **Plaintiff** by constantly monitoring the **Plaintiff**, **Plaintiff**' luggage and **Plaintiff**' computer. Further, Fuqua School of Business administration conducted several unknown searches against **Plaintiff** at unknown places.

62.    Fuqua School of Business targeted the **Plaintiff**, while there are several students publicly discussed about the guns that they own and the size of the bullets that they like to use and how recently that they fired the guns. Further, Fuqua School of Business perceived the **Plaintiff** as a threat to the school and justified their action by referring to the 2007 Virginia Tech shooting that left 32 people and the shooter dead.   Fuqua School of Business invaded the privacy of the **Plaintiff** and Duke University police profiled the **Plaintiff** as a risk.   The characterization of **Plaintiff** as a "as a risk" is libelous on its face. It clearly exposes **Plaintiff** to hatred, contempt, ridicule and such characterization is obloquy to the **Plaintiff** and might well create questions in a future prospective business client's mind. The following paragraphs depict that several students publicly discussed about the guns , yet Fuqua School of Business felt that the **Plaintiff** is a threat to the student body.

    **(i)**    On 21st October 2008, Jason Link communicated with the class as follows:{"Subject: I keep my hand on my gun, cuz they got me on the run. Don't think I've seen this discussed yet...politics aside...if you were looking for a first firearm, what would be your choice?  Basically, I'm looking for a gun to keep around the house and take to the range (mainly for the range)...Opinions? –J"}

**(ii)**   On 21st October 2008, John Espey responded to Jason Link as follows:{"Ah, another topic near and dear to my heart :-)  My first gun was a Springfield XD .45.  Very easy to use, easy to disassemble, clean, and assemble.  Reliable, and most importantly, VERY SAFE. The gun comes with your standard trigger safety.  Additionally it has a safety on the back of the handle that prevents you from firing the weapon accidentally while you've got the clip out (your hand has to be on the back of the handle, gripping tightly to discharge).  Also, there's an indicator at the back near where the hammer would be that has a pin that sticks out when a bullet is chambered.  There's also an indicator behind the site that raises up when one's in the chamber.  The idea is you can check visually or with a quick motion of your hand to know if the gun is loaded (important both when you DON'T want it to be loaded, and when you do).  For a beginner, I have not seen a safer gun, but I'm sure they do exist. I love my XD for home protection even though I own a much nicer H&K P30 9MM. The H & K is worlds lighter, much more comfortable in my hand, easier to conceal (it's rounded much more nicely, so not only because it's smaller), and fires much more precisely at longer distances on the range. The XD was half the price, safer, and easier to get started with, so if I were only buying one I'd make the same decision. I went with the .45 for home protection, which has awesome stopping power when loaded with hollow points.  You should also look at the .40, which has great stopping power too but much cheaper bullets and generally carries more bullets.  9MM is a good size, even cheaper than the .40, but there are questions about stopping power.  The general consensus is it will stop most people, but if you have a monster who is coked out or on PCP running through your house, the .45 will take the guess work out of how many to put in his chest. A lot of people will tell you to get a revolver, and I agree that for home protection purely, there is nothing safer (no misfires, much lower chance of shooting yourself because you left one in the chamber).  I love the S & W's and the Colts if you go that

route.  There are numerous choices of large calibers you can go with, such as .44, .38, and .357.  All will do the trick on stopping power.  But if you're going to spend time at the range, you'll find the automatics to be a lot more fun to fire.  Ohyea, you'll probably see a desert eagle .50 caliber when you shop, avoid the temptation.  While it's an enormous gun and could put down a t-rex if necessary (and it's so cool that biggie smalls and many other rappers sing about theirs), just keep in mind that the bullets run on the order of $5 to $7 each and you will never be able to carry the gun on your person. If you're interested in going to the range one of these weekends in RDU let me know and I'll bring a few guns for you to shoot.  I'm sure Barnes or Gunnar or Bobby would be down to make all of us non-military trained folks look like chumps :)"}

**(iii)**   On 21st October 2008, James Morgan responded to Jason Link as follows:{" "the fact that you've got "Replica" written down the side of your gun... and the fact that I've got "Desert Eagle point five O" written down the side of mine... should precipitate your balls into shrinking, along with your presence. Now... F*ck off!" "}

**(iv)**   On 22nd October 2008, John Thrush responded to Jason Link as follows:*{"Ah, Snatch... great movie!"}*

**(v)**   On 21st October 2008, Kristoffer Singleton responded to Jason Link as follows:{" Wow, nothing makes me want to go out and stimulate the economy like all this talk of watches and handguns. I have spent more time in the past week shopping on watch websites than in the past 4 years.  Given the prices, it might be cheaper to get the gun first. Espey, I would love to go shooting with you sometime (but bring a spare, 'cause I am not allowed a gun in the house), oh yeah -- wear your watch too ;) _Kris" }

**(vi)**  On 21st October 2008, Dan Paschke responded to Jason Link as follows:{"Espey...I am in as well, that would be an awesome time for sure. Like expensive watches, I also do not own a handgun but I dig shooting them. This could be the Ying to girl's yang of spa day after finals. Good topics this week in the Lair...well done gents. Somehow I'm thinking the handgun topic wouldn't have hit the student's lounge. - Dan Paschke"}

**(vii)**  On 22nd October 2008, Tim Barry responded to Jason Link as follows:{" Count me in on the range visit. Been thinking about this for some time.—"}

**(viii)**  On 22nd October 2008, John Espey responded to Jason Link as follows:{"The closest range I could find was the Sir Walter Raleigh Club, which is about half an hour away.  I can't tell if it is open to the public for general shooting or not, and there's no contact us link.  Dani's apparently closed its range but would have been a closer option.  Eagle 1 might be our next best bet .  It appears to be about 40 minutes away.  It's open until 7, so we could head there right after class on Friday.  I know there are many halloween events the next weekend we're in town, but I think we could still get in a good hour of shooting beforehand.  Reply to this post if you're game for the next Friday we have class and I'll bring a couple of toys.  Also, if you know of a closer range please let me know."}

**(ix)**  *On 22nd October 2008, Dan Paschke responded to Jason Link as follows:{"John...I'd love to but Friday of next weekend doesn't work for me as I'm going home to take my son trick or treating.  I have been in Florida for a work event every year since he was born so this is my first chance so I'd like to do it.  If you guys go another time, I am definitely in.  Thanks for sharing your toys. -- Dan Paschke"}*

**(x)**   On 22nd October 2008, Jason Sundberg responded to Jason Link as follows:{"
I'm up for some shooting before going out drinking Friday (probably better to
keep the shooting before the drinking and not vice versa).  I also will need to
rent a piece (even if I had one, I don't think Southwest would be cool with me
taking it on my flight to RDU). Jason"}

**(xi)**   On 22nd October 2008, John Espey responded to Jason Link as follows: {"I
don't mind folks using my guns (I'll bring 3).  You do have to rent them, even
if you buy ammo.  It'll probably be worth it to rent one or two as a group if
we get enough people.  I also officially am placing my vote that we eat
massively undercooked red meat and drink over-size beers after our shooting
foray.  If you've had a pedicure or gone to see any chick flicks lately it's a
very good way to feel redeemed as a man.  Any suggestions on good places
to get a good undercooked steak and a 25 oz beer? "}

**(xii)**   On 22nd October 2008, Doug Bashar responded to Jason Link as follows:
*{"Angus Barn in Raleigh!!! They also have a WILD TURKEY LOUNGE!!! GREAT
Place!!! I will definitely join you all if it's ok to drag a few women along. (not
to shooting but to eat)."}*

**(xiii)**   On 22nd October 2008, Doug Bashar responded to Jason Link as follows: {"I
have a Glock 21 that I will bring and also do not mind people using it."}

**(xiv)**   On 22nd October 2008, John Thrush responded to Jason Link as follows: {"...if
you were looking for a first firearm, what would be your choice? Basically,
I'm looking for a gun to keep around the house and take to the range (mainly
for the range)...Opinions? I asked this question a couple of years ago of
several people and the two answers I got were Glock and the M1911.  Glocks

are pretty popular for several reasons, usually because they've got multiple internal safeties and are reasonably accurate guns.  I've fired a few and can't really complain, but I can't say they really felt right. The M1911 is the classic automatic design... it's been around nearly a century, so they've had plenty of time to update it.  One advantage to this gun is that there are a large number of aftermarket upgrades that let you upgrade and modify the gun to your liking.  Various manufacturers make versions of it, but Colt was the original manufacturer and still makes one of the most highly regarded ones.  Rock Island Armory makes a good version as well that's highly regarded as a good value.  If you're shopping for a pistol, I highly recommend trying one of these out at the very least as a basis of comparison. As Espey noted, you really should try out a revolver.  They're very different than automatics in feel and operation, but some people prefer them and find them easier to control.  My friend let me shoot his Smith & Wesson .45 revolver at the range with custom loads that he's been working on for years - let's just say everyone at the range stopped firing when that hand-cannon went off.  Loud as hell, but nowhere near the recoil that factory loads have, meaning I actually had decent grouping.  I tried firing the same rounds in his brother's Desert Eagle and couldn't hit a damned thing.  His .38 was even easier to control and just as accurate using factory loads."}

**(xv)** On 22nd October 2008, Nat Hawkins responded to Jason Link as follows: {" I'm in for the range trip.  I'm happy to rent firearms at the range and merely "look" at John's.  Isn't firearm use free if you purchase ammo?  Anyway, let's find a place that has some for non-owners to use.  All off us can't be firing Espey's the whole time. –Nat"}

**(xvi)** On 22nd October 2008, Doug Bashar responded to Jason Link as follows: {" I'm in for another weekend, got some friends coming in town that weekend

and have to catch up with them. Coolest gun I've ever shot was an original "Tommy Gun" fully automatic .45. Unbelievable!!! (my uncle is a dealer in AZ) Gun dealer...not the other kind. –do"}

**(xvii)** On 22nd October 2008, John D. Cooper responded to Jason Link as follows: {" If you are purchasing for home defense, screw the handgun and buy a 12 gauge.  With 00 buck shot, it removes any guesswork.  Also, get a pump. There is a very distinct sound that goes along with chambering one, which may eliminate the need to pull the trigger if you know what I mean."}

**(xviii)** On 22nd October 2008, James Morgan responded to Jason Link as follows: {"I just think it will be funny when we all roll up with our new watch bling and guns."}

**(xix)** On 22nd October 2008, Kristoffer Singleton responded to Jason Link as follows: {"Wait ... was that a Warren G reference? _K"}

**(xx)** On 22nd October 2008, James Morgan responded to Jason Link as follows: {"Very much so."}

**(xxi)** On 22nd October 2008, Amit Khare responded to Jason Link as follows: {" Yup- that would be so cool. OK guys, wear your watches and go out shooting. I am looking forward to this now.-A"}

**(xxii)** On 23rd October 2008, Tim Barry responded to Jason Link as follows: *{" G-Unit!"}*

**(xxiii)** On 23rd October 2008, Jason Sundberg responded to Jason Link as follows: {"damn it feels good to be a gangsta! Since it's Halloween weekend, are we

throwing on the fur coats, hats with a feather, and bringing pimpin' canes as well?"}

(xxiv)   On 23rd October 2008, John Espey responded to Jason Link as follows: {" Four finger ring, gold link chain, and 24s on the g-ride"}

(xxv)   On 23rd October 2008, John Espey responded to Jason Link as follows: {"It appears to be 6:30 to 8:30.  Might be tough to get in guns, red meat, meade, and haloween partying.  I'm still game if people are."}

(xxvi)   On 23rd October 2008, Nat Hawkins responded to Jason Link as follows: {"This is tricky.  It looks like the party is immovable now too. Maybe we can go get red meat somewhere afterwards, like 9 pm.  Then maybe go somewhere cigar friendly.  We could all cab it out and back, since I'd like to take advantage of the free booze at the halloween party. Then perhaps Saturday after class we can hit the Range and who-ever needs to head home after an hour can. Dunno, just brainstorming."}

(xxvii)   On 23rd October 2008, John Espey responded to Jason Link as follows: {" I like the way you think Nat.  My only problem is I have to catch a plane in Charlotte around 7:30, so it would be cutting it close.  I'm game for the after part, cigars, scotch, etc.  If people still want to go shoot stuff and then head straight to the party I'm down for that too."}

(xxviii)   On 23rd October 2008, Kristoffer Singleton responded to Jason Link as follows: {"I was hoping that Nat had a solution with the range on Saturday proposal. I have some trick-or-treating to do with a certain set of kiddos that will opt me out of the early stuff, but I still want to make it back for the later side of things._Kris"}

**(xxix)**   On 23rd October 2008, Nat Hawkins responded to Jason Link as follows: {" Well, Saturday's are a hard day for people to schedule things after class.  We could postpone the Range to another weekend, but commit to the rest after the party ?"}

**(xxx)**   On 23rd October 2008, John Espey responded to Jason Link as follows: {" We need to think outside the box here.  I vote that you, Pashke, Sundberg, and myself dress up as shooters at a range, and we put big targets on Singleton, Morgan, and Bashar.  Then we go to the Halloween party AND get in our target practice."}

**(xxxi)**   On 23rd October 2008, Nat Hawkins responded to Jason Link as follows: {"This looks like a winner Doug.  http://www.angusbarn.com/welcome.html I mean it has a Whiskey bar, a walk in humidor, and a gun collection!  Not exactly close to school. http://tinyurl.com/6b2f74"}

**(xxxii)**   On 23rd October 2008, John H. Dohnal responded to Jason Link as follows: {"When in doubt, use what the professionals use: The Terminator: [In a gun shop] The 12 gauge autoloader. Shopkeeper: [Passes him the gun] That's Italian, you can go pump or auto. The Terminator: The .45 longslide, with laser sighting. Shopkeeper: [Passes the Terminator the gun, the Terminator "plays" with it] These are brand new, we just got them in. That's a good gun. You just touch the trigger, the beam comes on and you put the red dot where you want the bullet to go, you can't miss. Anything else? The Terminator: Phased plasma rifle in the 40 Watt range. Shopkeeper: Hey, just what you see, pal. The Terminator: The Uzi 9 mm.Shopkeeper: [Passes him the gun, the terminator "plays" with the first gun] You know your weapons, buddy. Any one of these is ideal for home defense. So, uh, which'll it be? The

Terminator: All. Shopkeeper: I may close early today [Bends down to get paperwork, terminator loads gun] there's a, uh, 15 day wait on the handguns but the rifles you can take right now [He gets up, notices the gun being loaded], you can't do that.The Terminator: Wrong. [Terminator shoots him]."}

**(xxxiii)**   On 27th October 2008, John H. Dohnal responded to Jason Link as follows: {"Get a little snub nose to keep on you bedstand. No question about whether its loaded or how it works."}

**(xxxiv)**   On 19th January 2009, John Espey communicated with the class as follows: {"Subject: Shooting Range, Dave, Pete, and I went to the range this weekend. Let me just warn you ahead of time, if you are thinking of breaking into a house in the Charlotte area, I would recommend avoiding Pete's. The best shot of the day came when he put the gun in his non-shooting hand, moved the target 50 feet away, and in one shot put one right between the eyes."}

**(xxxv)**   On 19th January 2009, Sankar Ramesh responded to John Espey' posting as follows: {" And be confronted by the snakes..if the bullets miss you...."}

**(xxxvi)**   On 20th January 2009, Uday Kumar responded to John Espey' posting as follows: {"Thanks for the warning "shot" John. I always knew Pete was trouble."}

**(xxxvii)**   On 20th January 2009, Scott Reid responded to John Espey' posting as follows: {"Also, Pete's tears can cure cancer. Unfortunately, he's never cried......"}

**(xxxviii)**   On 20th January 2009, Pete Walton responded to John Espey' posting as follows: {" Don't let Espey fool you. His bullets are twice the size of mine and he uses hollow points; might have a problem finding your entire mid-section when he pulls the trigger.....lol. And, your right Scott, I have never cried, haha."}

**(xxxix)**   On 20th January 2009, Greg Valentine responded to John Espey' posting as follows: {"Except when you watch horror movies, apparently."}

**(xl)**   On 05th February 2009, Pete Walton responded to John Espey' posting as follows: {"YUP"}

63.   The Defendant Jason Link started the posting about the firearm. Further, Defendant Jason Link personally approached along with other Defendant students Kristopher Singleton, Pete Walton, Doug Basher, Amit Khare, John Dohnal and Greg Valentine instigated the Plaintiff to talk about Plaintiff' opinion about the firearms. Further, after careful analysis of the posting by the Defendant Students, it is evident that they have premeditated to rope the Plaintiff into their web and complain against the  Plaintiff that Plaintiff carrying guns on the campus. The Defendant students started this blog with a goal to start some discussions about the guns and implicate the Plaintiff by fabricating and creating traps to the trap the Plaintiff and get expelled from the school. The date of the blog postings and the date of the starting spreading a rumor that Plaintiff is carrying a gun on the campus and the date of the complaint to the school administration that Plaintiff is carrying gun is a handy work of the above said student defendants. Further, it is evident that the Fuqua School of Business, Duke University targeted the Plaintiff among all other students who claimed that they have used and own guns.

64.     Further, Fuqua School of Business, Duke University called a plain clothes policeman
        to the WEMBA 2009 class party on 9th October 2009. The policeman is well dressed
        who is staring at the Plaintiff between 7:00 PM to 8:15 PM.  Initially, Plaintiff
        thought that he is a Duke's professor or may be a distinguished guest and probably
        starring at me, because he liked Plaintiff' grey pin stripes suite that tailored to fit
        Plaintiff' body like a glove. However, after a while, Plaintiff felt uncomfortable and
        introduced the Plaintiff himself to the person and asked him, whether he is a
        professor at Duke. The person replied that he works with police department and
        here on a patrol duty tonight. While the police officer is staring at the Plaintiff few
        WEMBA 2009 class made a shocking comment and called the Plaintiff as a "Pimp".
        Then Plaintiff thought that this is a strategy to irritate the Plaintiff and get the
        Plaintiff wild in front of police officer. Further, Plaintiff felt that this police officer in
        plain clothes invading Plaintiff' privacy and Plaintiff do not want to give the irrational
        WEMBA 2009 classmates an opportunity to trap the Plaintiff, hence Plaintiff left the
        party room early. After that, Plaintiff made an appeal to the WEMBA 2009
        classmates to explain the explain the Plaintiff in person or send me an email, about
        why would they think that, Plaintiff should deserve the respected title as 'Pimp'? or
        What great achievements of Plaintiff warranted them to award the "title".


**SLANDER AGAINST THE PLAINTIFF DURING TERM 3 AND TERM 4 - FUQUA SCHOOL
OF BUSINESS, DUKE UNIVERSITY DIDN'T  MITIGATE THE PEER PRESSURE AGAINST
PLAINTIFF:**


65.     **Plaintiff**' team members and marginalized and ridiculed the **Plaintiff** on several
        occasions and made false Honor Code violation complaint against the **Plaintiff**. The
        following depict the marginalization of the **Plaintiff**.


66.     On 21st February 2009, Shana Keating communicated with **Plaintiff** regarding team
        issues as follows: {"I feel like today's team meeting did not go well at all.  It
        appears we all are not on the same page.  Vamsi, during our meeting this morning,

you mentioned contacting Mark Brown to discuss our team dynamics in further detail. I think this is a great idea. I will contact Mark Brown and schedule a meeting for us on Friday, March 6. I will let you know his availability as soon as I hear back from him. Please respond to this email with any questions you might have. Thanks. Shana"}

67.    On 22nd February 2009, **Plaintiff** responded to **Shana** as follows: {"Thank you for the email and initiation. Actually, I have logged into my email system today (Sunday @ 7:30 PM) with an intention to write an email to team and also to Mark Brown, regarding the issues and seeking an advice how to resolve those issues. It would be better if we can resolve these issues even before 6th March, so that we can complete our team assignments. I am also copying this email to Mark Brown and would like to setup some time with Mark Brown and talk to him over telephone. If necessary as a team we can have a telephone conversation with Mark Brown and find an amicable solution to the logistics and other administrative issues as follows: (1) Using Fuqua's platform and online team boards for communication (email and team meeting telephone calls) and storage of the documents. (2) Work division between the team members and leading the team assignments. (3) Communication process and approach for tackling each assignment."}

68.    On 22nd February 2009, Mark Brown communicated with **Plaintiff** regarding team issues as follows: {"Hello, all. I am certainly willing to discuss the team's issues with any or all of you. Feel free to email me any information or perspectives on the situation (you may do so confidentially if you wish). If you would prefer to call, I believe I can be available Monday afternoon between 1:30 and 3:30. If those times do not work, please suggest some other times this week when you are available for a call. We can all work together to improve the situation. Best, Mark"}

69. On 23rd February 2009, **Plaintiff** communicated with the team members regarding meeting with Mark Brown as follows: {"I did get a chance to talk to Mark Brown today after noon and he mentioned that he is available to participate in a teleconference even in early morning or late evening. He is also available to talk to us in a face to face meeting on 6th March 2009. There is a value to our learning team to speak with Mark individually or as a team before 6th March, so that we can resolve the items on the table. What do you think? If any one of you access to our final team charter can you please email to Mark Brown?"}

70. On 24th February 2009, Robert Ball communicated with **Plaintiff** as follows: {"Vamsi, I talked to you on the phone yesterday and you said that the current setup will work for this week and that it would be OK to meet with Mark in person. After getting your input, I talked to Shana and Robert and they both agreed. Let's stick to the plan. Our team's focus should be on NCC. NCC is 25% of our grade and due on Saturday and we have little to show for it. Let's work together to get this assignment done and then we can solve our other issues with Mark in person on March 6th as previously agreed. Bobby"}

71. On 24th February 2009, **Plaintiff** responded to Robert Ball as follows: {"Bobby, I agree 100% with you that we need to concentrate on the NCC and you are correct that I have agreed to have a meeting with Mark, when we are in the campus on 6th March 2009. Please make a note that, when we spoke to each other, I am under the impression that Mark Brown may not be available for us after office hours and also all of our team members are busy during office hours. Therefore, I thought that having in person meeting would be the appropriate thing to do. I did speak with Mark Brown after we both concluded our conversation and Mark offered that he can be available for us even after office hours, so that we can have a team meeting with him and try o resolve the issues. With this new information, I thought that it would be a value to our team to have a conversation with Mark and resolve the issues even

before 6th March 2009. If we want to concentrate on NCC, who will lead the assignment and have a closure on the assignment? Due my previous experience with TMH and Economics papers and our recent experience with Navaneeth's ppt file, it seems that you (Bobby) or Robert is not happy with our work. At times, it appears to me that some of the team members are forgetting that we are a learning team and not a functional business team. It is very vital to recognize the difference between these types of teams. We can have very brief conversation about this at the end of our tonight's call."}

72.     On 24th February 2009, Mark Brown responded to the team as follows: {"All: Thanks very much for the energy that most of you are putting into this discussion of the team's issues.  Usually I would say that resolving the team's issues should take precedence over other team functions, but I don't think a quick resolution is feasible using conference calls and emails, especially when I consider what I am hearing about how pushed members of the team are in other areas of their lives. Based on my work with previous teams, I suggest that you proceed in the following manner: (1) continue with your work on urgent assignments/projects; (2) make sure that each of you emails me separately before next Wednesday to clarify what you think the team's issues are (it will be best if I can get each teammate's perspective); (3) consider when on March 6 you want to meet with me and how long you have for the meeting (usually these team discussions can take a few hours); I will be back in touch some time before March 5 with a proposed structure for your meeting.  Does that sound reasonable? Mark"}

73.     On 24th February 2009, Mark Brown communicated with team as follows: {"Hi. I enjoyed our talk yesterday.  I know that this idea of information gathering slows down the process somewhat, but I think it will give individuals a chance to talk with me and discuss how they personally think things are going.  Usually having a group discussion too fast suppresses some valuable information. I think your points about

the learning team concept are right on target; now let's see what the others say. It will give me the chance to ask pointed questions without doing so in front of everyone. I, too, look forward to seeing you next week.  If anything else comes up that you feel is relevant, do not hesitate to share it. Regards, Mark"}

74.   On 1st March 2009 Robert Ross communicated with **Plaintiff** as follows: {"Team, As we discussed and agreed this morning, I've submitted the final  write up for our NCC without Vamsi's name on the assignment. Overall, I think the four of us put in a pretty good effort and did a pretty good job on this case.  We learned a lot through our discussion and analysis. However, as I was spending my Saturday afternoon completing this assignment and seeing and enduring the consequence of Vamsi not having met his deadline(s) I have become quite angry.  For the record - **I AM MAD**. Friday night, Shana and I spent hours working on the final write up without the benefit of the cost analysis having been completed.  It was due at noon, but we were told at 6 PM that it wasn't done and that it would be done later that night.  The next morning at 9 AM at our (what should have been a review of the final product) meeting, we still didn't have anything from Vamsi, not even an email update - he didn't even come to the call on time!  So after reviewing what we had, Bobby provided a quick cost analysis that drove what we submitted.  The downside is that it didn't get much of a review and consequently was a first cut effort with no opportunity for team review.  (Individually good, but not at the level our team can produce.)  So after our call Shana did some editing and it all comes to me to wrap up with about 12 hours to go before the deadline on a SATURDAY where I had commitments that I had to  partially sacrifice.  (I sacrificed some of them and the team suffered some because I  didn't sacrifice all of them.)  So, as I am reviewing the "full solution" for the FIRST time, ideas and questions come to mind. I finessed the paper to defend our write up,  but we missed out on some of the analysis because we faultily relied on a team mate that didn't deliver in time to matter. So, I'm ticked and frustrated that our time LEARNING how to function well

and teach  each other how to attack and interpret problems has been spent dealing with this spat  that we're in now.   Vamsi - I am one of the most patient people I know, but your shenanigans are testing  my resolve.  I can't say that my patience is all gone, but you have worn it extremely  thin.  The ball is in your court to convince me why I should rely on you, or even bother working with you at all.  I will not fault you if you choose not to try to earn back respect from your teammates.  I  think it is a job not worth pursuing for you.  The likelihood of being successful is slim.  My personal sense is that others on our team are more frustrated with your actions than I am.  You've dug a trench and you don't have much time to correct it.  You should  spend your time working on your own, doing your thing, learning your way, on your schedule and let the rest of the team deal with ourselves.  The sad thing is that you do  have something to contribute to the team.  You have a perspective and an insight that  can be valuable.  You're just not delivering it; at least not in a way that is working.  However, because I respect you and I haven't lost all faith in you, I'll be there on Friday   and will give you, Mark Brown, and the rest of the team everything I've got.  – Robert"}

75.   On 1st March 2009, **Plaintiff** communicated with Mark Brown as follows: {"Dear Mark, Have been talking about this for some time and although there is meeting scheduled on Friday, as you can see the matter has gotten worse and it is now jeopardizing the vital education that duke has promised. In preparation for the meeting, what documented guidelines available for the following: (1) Assigning a team leader (2) Grievance resolution between team members ¨    Inclusion of all team members in a case history ¨    Lateness for submission of work to the team¨    Working the team outside of the Duke infrastructure platform¨    Submitting the case history outside of the team ¨    Preconception, Partiality, Predilection, Predisposition and Bias by a team member ¨    Resolutions Thank you for your assistance to provide information regarding the above. This could be a powerful learning opportunity for all of us. Have some thoughts about why this occurring and

what to do about it and looking forward to your thoughts and Roberts thoughts for a right conclusion."}

76.  On 1st March 2009, **Plaintiff** clarified to the team as follows:  {"Team, It was very difficult to understand what Robert is upset about with his use of colloquial expressions. Because of being accused of doing no work for this project or substandard work, I would like to provide the team some facts and figures that might lead to the truth about this matter. The following is a list of work I performed for this case history: (1)   Read the case and supporting material supplied by professor (2)   Participated in four team conference calls - giving ideas, challenging others ideas, providing facts from the case (3)   Communicated with the professor to clarify whether the case is about flow or a batch process (4)   Created a new flow diagram for the case   to replace the flow diagram prepared by Navaneeth as per Bobby and Robert's suggestion. (5)   Case data entered into excel data sheet (6)   Applied macros, formulas and calculations for the excel data sheet (7)   Prepared cost analysis for different  situations. (8)   Approximately 25 hours spent on this case personally.  In addition have been requesting that team consider changes to the leadership structure  in order to allow all the team members to have a chance to experience leadership of  the team. For example while Shana Keating is the best writer because of her English  back ground, it might be a value to Shana to try out a different role and for me to try a  different role as well. Another example is that perhaps that it would be a benefit to  Robert to be part of a team where someone else leads the team and close the case. He  might experience a different leadership style than an authoritarian style. Perhaps  Navaneeth or myself get the case writing experience. Perhaps Bobby would like to try  Team leader roll for himself. As you might notice from my comments here, that I have  spent even additional time thinking about the team talents and considering where the  team members might advance their skills. Also the time spent to communicate with  Mark and outside counsel about the team communication is not included in the above hours."}

77.   On 4th March 2009, **Plaintiff** communicated with Pranab Majumder as follows: {"Dear Professor Pranab, This is further to my telephone call on last Saturday morning, I am experiencing extreme difficulty to deal with two of my team members, and especially these team members escalated the conflict within the team and took the liberty to remove my name from the team project, which is against the Fuqua's team charter. Actually, these two team members threatened me that they will remove my name from the course assignments in Term 3, but did not do that. Therefore, I did not escalate the tension between the team and gulped the offending/insulting remarks. However, in this term Operations Management, the team project is 25% of the total course grading. Therefore, these two team members deliberately attempted to hurt my course grades by removing my name from the team project.   In fact, I have been requesting my team member to change the leadership structure, but somehow these two members deliberately avoiding the team meeting. Therefore, I have escalated the issue with Mr. Mark Brown, who is a Fuqua School designated person to resolve these kinds of issues. Whatever the reasons may be, the team did not agreed to have a teleconference with Mr. Mark Brown for the last two weeks and resulted with this issue. I am willing to work separately and submit my casework. Can you please suggest me a solution to count my work towards the team project? Here I am forwarding the email correspondence exchanged between the team members for your information and perusal."}

78.   On 4th March 2009, **Plaintiff** communicated with Mark Brown as follows: {"Dear Mark Brown, This is further to our last conversation about the team dynamics, here I am forwarding an email from Dean Gallagher for your information. I do not know who reported on me, but my conversation during our telephone call is just conversational, but the team member is nasty and resorted to blame - game, just because I have requested the team to work on consensus basis and these team members are making it very difficult for me."}

79.     On 8th March 2009, Shana Keating communicated with team as follows:  {"Hi all, Here is a summary of the resolutions from our meeting with Mark Brown on Friday evening.  If I have omitted or misrepresented anything, please respond by 8:30 am on Wednesday, March 11.  Unless I hear otherwise, I will assume that you accept all items listed below. Team Meetings

- Team meetings will be held on Tuesdays at 9:05 pm and Saturdays at 9:00 am.

- Changes to or additional team meetings will be considered as necessary.

-Team meetings will last a maximum of 2 hours and will focus on pre-determined topics.

- The first Tuesday team meeting will include a 15 minute debrief of the assignments completed for the prior class session.  This debrief will include both positive and negative feedback regarding the process (what worked, what didn't).  This debrief will last no more than 20 minutes.  Additional discussion may be addressed via e-mail if necessary. Conference Call Numbers -We will use Bobby's conference call number for all calls moving forward. 866.782.2593, passcode = 768.9739#

Team Leads

- A team lead is a facilitator/coordinator.  The team lead will work with the team to divide assignments into tasks that will be assigned to individuals on the team (much like we did for the Industry Analysis case for Strategy).  The team lead will work with the team to determine a calendar of deadlines and what will be discussed at each team meeting.  The team lead will keep track of assigned tasks, due dates, and progress.  It is the responsibility of the team lead to facilitate discussions and ensure that all tasks are being completed in a timely manner by teammates.

-After discussing assignments or specific tasks during a team meeting, a decision will be made at the end of that meeting to close that task and move forward.  These decisions will be approved by a majority of the team (3 or more).  Discussions are capped at 2 hours and a vote will be taken at the end of the meeting for unresolved

decisions.  Once a majority decision has been made, we move forward and do not revisit.

-A team lead is NOT an autocratic decision-maker and does NOT have final and/or sole decision-making authority.  Decisions are made by the team and final decisions are made by majority approval.  The team lead does NOT do all the research or a majority of the work for any given assignment.  The team lead does NOT do the majority of the talking on conference calls; he/she facilitates the conversations to ensure feedback from all participants.  The team lead does NOT have the authority to defy team decisions to pursue his/her own opinion.

Repercussions

- If your contribution to the team will be late, you must notify the team as soon as you know that your contribution will be late.  Notices at or after the deadline are not permissible.

- If someone's contribution is submitted late, this person is at the mercy of the team. A majority vote (3 of 4) will determine the repercussions.

- If someone does not contribute at all for any given assigned task, this person is at the mercy of the team.  A majority vote will determine the repercussions.

Quality Contributions

-The quality of contributions is measured by the team.  Final contributions and what is or is not included in the final decision is determined by a majority of the team (3 of 5).

-If contributions are not included, the team must provide a reason why this contribution is not included in the final submission.  If your contribution is not included, you must accept this decision and accept the feedback of your teammates.

Assigned Team Leads

- Industry Analysis:  Shana

- Home Depot Analysis:  Vamsi

- Leadership:  Navneet"}

**FALSE HONOR CODE COMPLAINT AGAINST THE PLAINTIFF:**

80.    On 27th  February 2009, John Gallagher communicated with **Plaintiff** as follows: {"Vamsi: I hope you are doing well.  I would like to have an opportunity to talk with you at your convenience.  Is it possible that you would be free to speak with me sometime on Monday?  There is a matter that has come up and I would like to have a chance to speak with you rather than just write an e-mail message. At the moment, I can be free anytime on Monday.  So, if that will work  for you, please just suggest a good time for me to call and give me a number where I can reach you. All the best,"}

81.    On 27th February 2009, **Plaintiff** communicated with John Gallagher as follows: {"Dear Dean  Gallagher , Thank you for the email. Two Deans in one month! had an exciting lunch  with Dean Blair Shepherd, who is a very knowledgeable and gracious host. In order to  manage the time you need with the hectic work schedule, it would be of value if you could please say what is the agenda and how much time you want and what is the right time for the call?"}

82.    On 2nd March 2009, John Gallagher communicated with **Plaintiff** as follows: {"Vamsi: You can call me anytime between 3 and 4:30.  An issue has come up regarding the Honor Code and I want to talk with you about it.  I know that sounds alarming, but I do not want you to be worried about it.  When a question like this  comes up the Honor Code requires that I talk to the individuals involved and gather some facts for review. Many times this is nothing more than a misunderstanding that is cleared up quickly. That said, it is necessary for us to talk about it and I appreciate your time. You can just call my desk phone (919-660-7641) and it will forward to my cell phone.  I am working from home today - Duke is actually closed due to the weather conditions. I look forward to talking with you"}

83.   On 2nd March 2009, **Plaintiff** communicated with John Gallagher as follows: {"Dear Dean Gallagher , It is alarming to here this from you, because Robert Ross threatened this on a team call when I mentioned there being a lot of information about this case history - none of which was used by on the work of the case. Been having significant trouble with Robert who has made himself for all the case work and now is of course making the ultimate insult by accusing me of an honor code violation. Been working with Mark Brown to manage this issue and have been trying to keep from reporting Robert as prejudice. Will forward you the emails working with mark brown and you can have the back ground information. My feeling is that as result of his prejudice he has under estimated my ability to perform the complex work that I have been doing on my own. Would have preferred to have conversations with you about how the program and duke could benefit more from my powerful  history in India. Perhaps you and i should take the 20 minutes for you to hear my history from India. There, in spite of beatings, threats and police harassment I successfully steered the university management to eliminate their self interest quotas for upper cast students. This quota was then applied to lower cast students who are now able to get more number of seats in the colleges. I abide the honor code under even in sever conditions in India and would never do anything to jeopardise my own personal money investment for my MBA."}

84.   On 2nd March 2009, John Gallagher communicated with **Plaintiff** as follows: {"Vamsi: Thank you for calling and talking with me today.  As we discussed, a student raised a question regarding a statement you made and the Fuqua School Honor Code.  As you may know, I do not have any discretion in the matter, I must investigate.  Our conversation was very helpful to me.  However, I must  ask you to respond to a couple of questions so I have something in writing. As we discussed, the question was based on a statement that you may have made during a team meeting discussing a case in your operations course.  I do not have an exact quote, but the student who brought this matter to my attention thought you said something about

having done a web search on the case and that you were looking for answers or information about the case on the web. I have not spoken with the student or with the instructor. So, I do not know if looking for outside information is allowed or not allowed on this assignment. But, if you could please just tell me in your own words (1)What do you remember saying during this team meeting about searching for outside information on this case? (2) Did you search for outside information on this case? (3)Did you bring any outside information to the team as part of the discussion of this case and its solution? (4) Is there anything else you can add that would help clear up what you did and did not do in terms of searching for and using outside information in working on this case? I appreciate your time in answering these questions."}

85.     On 2nd March 2009, **Plaintiff** communicated with John Gallagher as follows:  **{"** Dear Dean Gallaghe, Thank you for your time. Here my responses to the questions . **1. What do you remember saying during this team meeting about searching for outside information on this case?** Vamsi) I do not exactly remember what I said in a team meeting, however I remember the idea was to be conversational and to give some encouragement to the team. The case was simple and straight forward and been administered by several business schools, so I wanted to break up some of the tension among the team members with this encouragement. **2.     Did you search for outside information on this case?** Vamsi)  No **3.   Did you bring any outside information to the team as part of the discussion of this case and its solution?** Vamsi)  Yes, in one of the early team meetings, I have inferred that the process in the case can be completed in a batch process, because the process flow is  similar to the pharmaceutical formulation unit that I have co-promoted in Hyderabad, AP, India. After I have obtained clarifications from Professor Pranab Majumdar regarding the process in the case should be inferred as a flow, I have corrected my spread sheet model. In the later team meetings,  I have contradicted with the opinions expressed by Robert Ross and Robert Ball (Bobby) that each truck contain 70% wet

and 30% dry berries and mentioned about my experience with importing and unloading the coal from the rail racks at thermal power stations. **4.     Is there anything else you can add that would help clear up what you did and did not do in terms of searching for and using outside information in working on this case?** Vamsi)  I have direct on hands experience on numerous occasions in my business venture Roofers Plastics Pvt Ltd, a manufacturing unit of bubble warp for packing electronic equipment(s) and that this case is straight forward that there is no reason to seek outside information. Why should I risk my high value education, when I had a feeling that the work is not going to be included in the final case write-up?  Sadly I feel that reporting this kind of off-handed conversational comments as an honor code violation is further evidence  that the team is severely distressed, dysfunctional and in an unproductive state of mind.  I will share this information with Mr. Mark Brown."}

86.   On 23rd March 2009, **Plaintiff** communicated with John Gallagher as follows: {"Dear Dean Gallagher, This is further to your last conversation regarding honor code violation and my subsequent conversations with Mark Brown regarding team norms, my fellow team members are finding creative excuses not to include my contributions in the last two team assignments. Dead Poets Society assignment in Leadership and Industry Analysis in Corporate Strategy courses. Team members are reluctant to entertain any suggestions and I am not in a position to spend unlimited amount of time to convince my team members. So I want to work alone on the course assignments. What need to be done in order to get permission from the school management to work alone?"}

87.   On 23rd March 2009, John Gallagher responded to **Plaintiff** as follows: {"Vamsi: I can speak with you tomorrow, Tuesday, at almost any time, so if that  will work with you, suggest a time or two and I will confirm.  If Tuesday will not work for you, I also can make time on Wednesday.  But, on Thursday I go to India and will be out of the

country until April 7th.  So, it would be best if we could find a time on Tuesday or Wednesday that works for both of us. There is no provision for students to complete team assignments individually.  That is, you cannot just choose to work on your own. And, your team can not just choose to work without you.  I know that this can cause some very difficult situations.  Is Mark Brown working with you and your team?"}

88.   On 29th April 2009, John Gallagher communicated with **Plaintiff** as well as the team as follows: {"Vamsi: I sincerely regret that this situation has added stress to your student life.  I know that this situation has been very difficult.   Honor Code investigations are necessarily stressful and difficult situations to manage. I have a few comments about your situation that I can share with you without violating any confidentiality, and that might be helpful to you. First, once someone raises the possibility of an Honor Code violation, I am required to launch an investigation with two student investigators to assist me.  I have no discretion in this.   And, the investigation must be treated seriously - I cannot prejudge the situation.   The evidence must be gathered in an unbiased way.  Every attempt is made to keep the entire process confidential.  And, it necessarily takes a little time to formulate the questions, gather the information and to consult with the investigators and decide on next steps.  All of this added to your stress, I am sure.  Just waiting and not hearing anything is difficult. But, once the evidence was gathered, the three of us unanimously and independently came to the conclusion that there was not sufficient evidence to go forward with a formal case.  And, I think any group of reasonable people would have come to the same conclusion. In my own way I have done some informal probing to determine the extent to which there has been any "talk" about the case among the class.  You told me that someone mentioned it to you - so obviously some information got out.  But, I could not find any evidence that there was any widespread awareness of the investigation.  I had to ask very carefully as I did not want to unintentionally start any rumors myself.  But, I did not hear anything that worried me, and I still have not heard another word about it from anyone.  So, I

am hopeful that the situation is contained well enough. It is quite clear to me that there is some significant tension and difficulty on your team.  And, I know that the question of your possible honor code violation came up in the context of a team meeting.  But, I have no evidence or information that would lead me to believe that anyone plotted or conspired to bring up the honor code issue.  I would be happy to talk with you about this further if you wish.  But, you should know that the matter has been totally silent from my point of  view since it ended. Jg"}

89.   On 29th April 2009, , **Plaintiff** communicated with John Gallagher as follows:  {"Dear Dean Gallagher,  Thank you for your email. Appreciate that the potential honor code violation  issue is treated with care and reviewed thoroughly as per Fuqua's Honor Code. Am happy that the case does not present sufficient evidence to warrant  a formal hearing by the judicial board and the matter is officially closed.   The allegation of honor code violation and subsequent investigation process  has caused a severe hardship to me and to my immediate family.  It is always  been my goal to learn as much as about business as possible and that is why  personally I am bearing 100% of the tuition fee, commuting expenses, and  time for the study. However this does not seem true about those who made the  allegations. It is evident from the behavior of the few team classmates that  they have resolved to jeopardize my learning opportunity, by causing     unavoidable distractions.     The lack of confidentiality in the process and the fact that just, right  before the perceived honor code violations incident, I have expressed my  strong dissent regarding autocratic leadership style adopted by few team     members and sought Mark Brown's intervention for a resolution makes the  truth more clear. Even though we have reached a formal agreement regarding  the modalities of the team's functionality, assignment preparation and  submission, the agreement has been violated grossly in two assignments (1)   Dead Poets Society in Leadership (2) Industry Analysis in Corporate   Strategy. My personal contribution to the team assignments has been grossly  neglected by the few team members in the 3rd and the current terms.

These facts cause me to sincerely believe that this reporting of off-handed conversational comments as an honor code violation and not using my work is clear evidence that someone is angry, and politically or competitively motivated. Would like the record to reflect these facts and respectfully request to know what recourse there might be?"}

90.   On 24th March 2009, John Gallagher communicated with **Plaintiff** as well as the team as follows: {"I am writing in regard to the investigation into a potential violation of the Fuqua School's Honor Code. First, let me thank you for bringing the matter to my attention, for your thoughtful and timely responses to my requests for information, and for your compliance with the requirement for strict confidentiality. I have included Harold and Barnes on this note, as they were involved in the original transmittal of the issue to me. I want to assure you that this matter has been treated with care and thoroughly reviewed in keeping with the procedures outlined in the Honor Code. Two student investigators from your class were appointed to assist me in the investigation and the analysis of the resulting evidence. These students took their roles very seriously. Collectively we spent considerable time and effort reviewing and discussing the details of this case. While I cannot identify the individual students due to the confidentiality constraints, I want to let you know that your classmates have given generously of their time and attention. Every effort was made to resolve the issue as quickly as was consistent with the care and attention the situation required. By unanimous decision, we concluded that this case does not present sufficient evidence to warrant a formal hearing by the Judicial Board. As required by the Honor Code, the matter is now officially closed. I believe it may be helpful for me to put this case in the context of other cases with which I personally have been involved. In my years in this role, I have conducted several investigations across all of our Executive MBA Programs. Of those, only this one and one other has resulted in a recommendation not to go forward. Of the eight EMBA students who have been required to undergo a formal hearing by the Judicial Board,

all have been convicted and sanctioned. The school takes  these matters seriously and does not shy away from its responsibility to  enforce the code and act when appropriate. Finally, pardon my repeated references to the need for confidentiality in this matter, but I do appreciate your continued compliance with this requirement. If you have any questions of me regarding the process, I am happy to  speak with you and provide any information that I am free to share. I imagine that this situation has been stressful for you and your team  mates. I am hopeful that its resolution will allow you to move forward  from this point. I wish you all the best in completing your program and  again thank you for your thoughtful participation in this process. John Gallagher"}

## **IMPROPER GRADING IN THE IN CORPORATE STRATEGY COURSE BY THE FUQUA SCHOOL OF BUSINESS:**

91. On 14th May 2009, Alaina Filkin communicated with **Plaintiff** as follows: {"Hi Vamsi, It was brought to my attention that you received an "LP" in Corporate Strategy.  I wanted to follow up with you to make sure everything was alright.  Additionally, I wanted to make sure you were aware of the "strike rule", which is attached, and is Fuqua's policy regarding grades.  You will need to maintain a 3.0 GPA or higher to graduate in November. If you have any questions, please let me know. Regards, Alaina"}

92. On 14th May 2009, **Plaintiff**  communicated with Alaina Filkin  and  John Gallagher as follows:  {"Dean Gallagher and Alaina, Corporate Strategy professor is very harsh and brutally punishing me for a small mistake and I my small mistake do not deserve an LP  for this course. I want to appeal my grade and let me know the process."}

93. On 14th May 2009, John Gallagher communicated with **Plaintiff** as follows:  {"Vamsi: I will help you with the process for appealing a grade.  It is fairly straightforward.  I

will summarize some of the material for you in a separate e-mail I will send shortly. Jg"}

94.     On 14th May 2009, John Gallagher communicated with **Plaintiff** as follows: {"Vamsi: I did not want to include all of this information in my first reply to your note, as I did not want to have Alaina included in the conversation regarding your honor code investigation.  In terms of that investigation, I have appointed two investigators, as I am required to do.  We have reviewed the statement that you provided regarding your taking of the test.  And, we have reviewed Professor Fabrizio's history of communications with you about the exam.  Soon I will be sending you one set of questions that we would like you to answer so we can complete this investigation and decide what to do in regard to the honor code violation.  Based on the result of that investigation, the case will either be dropped, or it will go forward for a formal hearing. The honor code issue is, of course, related to your taking of the final examination.  But, I think these two issues can be addressed individually and separately if you want to pursue the grade dispute right away, rather than wait for the result of the honor code investigation. I have copied and pasted the procedure for a grade dispute below. As you can see, you must submit to me a summary of why you feel the grade is not correct.  That can be a simple note or a more detailed rationale.  But you must submit your case in writing to me, along with any supporting material you think is relevant.  I will ask Professor Fabrizio to submit a similar statement.  Then, as you can see, the case is reviewed by a committee of faculty. Please let me know if I can answer any additional questions for you in this regard or give you any counsel on this matter, or on the honor code investigation that is currently underway. Jg

95.     On 24th June 2009, John Gallagher communicated with **Plaintiff** as follows: {"Vamsi: I have received a copy of the memorandum prepared by the faculty committee that reviewed your grade review request.  They denied the appeal and the grade will

remain as posted. I have reproduced the text of that memorandum below for your review. If you have any additional questions about the result, its implications, or the process involved, please do not hesitate to contact me.  John Gallagher"} {"To:  Blair Sheppard,  Cc: John Gallagher, Jennifer Frances Date:  June 23, 2009,  We are writing in reference to a grade dispute brought by Vamsidhar Vurimindi (Vamsi), a WEMBA class of 2009 student, concerning the course Corporate Strategy, 430W taught by Kira Fabrizio. In order to evaluate this dispute, we each read the materials provided by John Gallagher (including the dispute and background information provided by Prof. Fabrizio) and we gathered additional information from the WEMBA platform and course discussion board. In brief, we find no basis for the student's request for a grade change.  We find that Prof. Fabrizio acted fairly and professionally.  Some specific points we considered include: 1.  The student states that he was unaware of the specified time for the exam and was unable to access exam-relevant information due to internet problems.  However, information regarding the exam time was clearly posted on the course platform, starting before the time that the student states his internet access problems started.  In fact, this student had to communicate his desire to take the final exam remotely following the instructions posted by Prof. Fabrizio, and these instructions clearly stated the date and time of the exam.  More generally, we believe it was the student's responsibility to familiarize himself with the exam requirements and conform to these.  We also note that the student was late to submit his exam even by his stated understanding of the exam time, and that Prof. Fabrizio needed to contact him to receive the exam.  Note that we did not deliberate regarding the applicability of the honor code here, because whether or not the code is referenced, we believe it is entirely appropriate for a professor to penalize a student who fails to hand in an exam in a timely manner.  2.  Many of the students' requests and assertions seemed irrelevant to our role.  For instance, Prof. Fabrizio, not our committee, has the knowledge and responsibility required to assess class participation.  If the student had an issue with how his classmates' attitudes (or other related issues) were influencing (or

potentially influencing) his ability to contribute in class or on teams, we believe the student should have addressed this matter with the professor while the class was ongoing. Our assessment based on the information provided to us is that the penalty of docking points on the exam was entirely appropriate and not punitive."}

96.     On 24th June 2009, **Plaintiff**  communicated with Alaina Filkin  and  John Gallagher as follows: {" Dean Gallagher, Thank you for communicating the decision about Grade Dispute Resolution.  Faculty committee conclusion is correct, that I cannot defend the mistake about the timing of the exam. I made an appeal to the professor don't be harsh about my minor mistake and to consider my other contributions towards the course project work.  This low grade would hurt my overall course moving average and also hurt my future prospects, if I start looking for a consulting job.  Is there any way that I can retake this examination?"}

97.     On 24th June 2009, John Gallagher communicated with **Plaintiff** as follows: {"Vamsi: I am happy to talk to you about this if you would like.  The short answer to your question is no.  A faculty member is not allowed to re-test a student or offer any other evaluation for that student that is not also available to all students in the course.  There is a very narrow set of reasons that a faculty member can change a grade.  A student can request that part of an exam be re-graded if they feel the exam was not properly graded, but the instructor is not required to do it.  And, as in your case, the student can appeal the grade to an outside group of faculty.  You did this and the answer was no.  There are no further appeals and no provision for you to retake the exam or to be re-evaluated. I know this is not relevant to you, but the faculty involved in this review were very thoughtful in their review of your appeal. As part of the review, I surveyed all of the faculty about their policies and practices regarding students who are either late turning in an exam, or who work outside of the time limits.  This information was used to make sure that the penalties imposed by Kira were consistent with the broad set of practices that are used by our faculty

as a whole.  So, they took great care to make sure you were being treated fairly and consistently with other students and other faculty. The outcome is certainly not a good one for you in the way that it impacts your record, but I am sure that the decision was fair and consistent with our standards and practices across the school. Jg"}

### SLANDER AND LIBEL AGAINST THE PLAINTIFF BY THE STUDENTS:

98.   **Plaintiff** believed that the Fuqua School of Business emphasis on diversity would enforce a congenial classroom environment, which is important to have good professor and student relationship. However, for some unknown reason classroom environment is not welcoming, classrooms are not congenial to have conversations, while preserving **Plaintiff**' own values and beliefs. **Plaintiff**' ethnic background, language, age, and marital relationship is not considered as a norm of this country, hence, **Plaintiff** have different experience, the majority rejected the **Plaintiff** and stripped **Plaintiff**' privileges.  Some professors picked on **Plaintiff** for no apparent reason and treated differently from other students, awarded low grades on tests and harsher treatment for late submission. Even further, some professors targeted **Plaintiff**, because **Plaintiff** did not fit the image what professors think an Executive MBA student should be. Majority student population perceived **Plaintiff** as different, and covertly discriminated by isolation, marginalization, segregation, and by tarnishing the image of the **Plaintiff**. Further, the Fuqua School of Business had no place to bring **Plaintiff**' complaint, where **Plaintiff**' perspective is respected. In short, **Plaintiff**' basic purpose of admitting into Fuqua School of Business  is to learn and cultivate new relationships while respecting students' privacy and rights is defeated. The discrimination by the Fuqua School of Business is systemic and made possible, because the school system and admissions policies are designed to perpetuate the discrimination and created an unequal playing field for **Plaintiff**. It is shocking that the **Defendant**s from the student body is not interested in the business and it was

surprising to hear so many malicious, false, slanderous remarks from the student body as well as school administration. In short, Fuqua School of Business' admission policy is diagonally opposite to the Duke University' founders wishes: {I request that great care and discrimination be exercised in admitting as students only those whose previous records show the character, determination and application evincing a wholesome and real ambition for life. -Mr. J. B. Duke, The Indenture of Trust}

99.  The **Defendant** students made several malicious, false and slanderous accusations and comments directed towards **Plaintiff**. The sole purpose of the **Defendant**s accusations and comments is to inflict pain and see that **Plaintiff** is expelled from the school and suffer reputation and financial loss.

   i.  During the on-campus one (1) week orientation program, as per the script from the **Defendants** Moira Ringo and Jason C. Link,  **Defendant** David Mitchell made malicious, false and slanderous accusation against **Plaintiff**, that **Plaintiff** is a cheater and suggested to the **Plaintiff** to read a book about, "How to Lie Without Getting Caught" by the lie detector. **Defendant** David Mitchell made the above said accusation while Plaintiff and **Defendant** David Mitchell travelling in a bus to the Triangle Training Center along with other classmates. Further, on 9th October 2009, just before the start of the WEMBA 2009 class party, Plaintiff is relaxing in the R. David Thomas Center lounge. Then three classmates Wilker Ambooken, Vijay Karunakaran and Gupta approached the Plaintiff and asking whether Plaintiff is attending the WEMBA 2009 class party or not. At the time **Defendant** David Mitchell approached the Plaintiff and other three classmates, and suggested to them "take this Mother Fucker to the class function" the rest will be taken care by its self and further made hand gestures to the above said three classmates to get the **Plaintiff** into trouble. **Defendants** David Mitchell and Eugene White are the team mates of the Plaintiff in Term 1 and Term 2.

ii.   During the last minute of the Statistics exam, at the instigation of the **Defendant** Pratibhash Chattopadhyay, **Defendant** Jennifer Erickson made false and slanderous accusation against **Plaintiff** calling **Plaintiff** as a "criminal" in front of the Professor Jill Stowe. When, **Plaintiff** asked for a clarification for the comment made by the **Defendant** Jennifer Erickson, **Defendant** Jennifer Erickson did not provided any further clarification or justification for her comment. Further, Professor Jill Stowe was mere spectator during the event. However, Professor Jill Stowe subsequently failed the Plaintiff in her course.

iii.  During the Term 4, when Plaintiff is waiting in the RDU airport' restaurant to catch a flight back to Philadelphia, **Defendants** Jennifer Erickson, Jason Sundberg and Jason C. Link and other six classmates joined the Plaintiff. During that time **Defendant** Jennifer Erickson slander against **Plaintiff** that **Plaintiff** is a "Gay" in front of other class students.

iv.   On 24th January 2009, after Plaintiff has a meeting with Bill Boulding, Senior Associate Dean, and Mohan Venkatachalam to talk about the allegations against the Plaintiff that Plaintiff carrying a gun in the campus , Plaintiff and few other WEMBA 2009 class students joined for drinks at a local Taylors Bar & Restaurant. During that time, a WEMBA 2009 classmate Kevin Guisti suddenly approached the Plaintiff and pulled off the Plaintiff' blazer and searched the Plaintiff' coat pockets. It is an un-official search conducted by the Kevin Guisti. However, Kevin Guisti didn't find any gun in the Plaintiff' coat pockets. Immediately, **Defendant** Douglas Bashar made a false comment by calling **Plaintiff** as a "He is lying" in front of the students of the class. Then immediately, Plaintiff left the Taylors Bar & Restaurant and called the **Defendant** Douglas Bashar over phone and demanded an explanation

about his comment. However, **Defendant** Douglas Bashar evasive and did not answer the Plaintiff' question.

v.   During Term 3, in the month of December 2009, when **Plaintiff** sitting in the R. David Thomas Center' bar,  **Defendant** Amit Khare ridiculed the **Plaintiff** in front of the several WEMBA 2009 classmates that "none of the classmates believe you". Further, **Defendant** Amit Khare several times discouraged, ridiculed and insulted **Plaintiff** for expressing **Plaintiff**' opinion and contribution to the various discussions in the course board.

vi.   During the first partners weekend in June 2009, **Plaintiff** and **Plaintiff' wife,** along with the **Defendant** Rajiv Kolagani' family and WEMBA 2009 classmate Anj Balusu,  **Defendant** Rajiv Kolagani slander the **Plaintiff** that **Plaintiff** is "illegal" in this country. Further, during the Term 3 , in the month of December 2008, when Plaintiff, Anj Balusu, Jamie Thompson, Brooke Balcom and **Defendant** Rajiv Kolagani having dinner at a nearby restaurant, **Defendant** Rajiv Kolagani slander against the **Plaintiff** that **Plaintiff** had a police "Rap Sheet" in India.

vii.   During Term 4, in the month of March 2009, that is right after **Plaintiff'** consulting assignment contract terminated by the Wyeth, when Plaintiff is leaving the class after the class is over, **Defendant** Pratibhash Chattopadhyay ridiculed **Plaintiff**, that "every tom dick, harry wants to be leaders, you can't run even a small restaurant" in front of several WEMBA 2009 classmates. Further, **Defendant** Pratibhash Chattopadhyay slander against **Plaintiff**, that **Plaintiff** is "low self esteemed person". Further, **Defendant** Pratibhash Chattopadhyay sarcastically make comments each time when he notice someone slander the Plaintiff, then approach the Plaintiff, and say that "is this humiliating to you?".

viii.    In the month of December 2008, during the finalization of the Term 3 macro economics course term paper, **Defendant** Shana Keating falsely accused the **Plaintiff** that **Plaintiff** "plagiarized" the macro economics course term paper. Further, **Defendant** Shana Keating made several hand and facial gestures in front of the several WEMBA 2009 classmates during the class breaks, conveying a meaning that  **Plaintiff** is not intelligent.

ix.    During Term 3 and Term 4, **Defendant** Robert Ross several times ridiculed the Plaintiff, that Plaintiff "has dug a hole for himself to get buried"; "Plagiarized during the undergraduate degree course and probably Plagiarize now"; **Defendant** Robert Ross ridiculed the **Plaintiff** that **Plaintiff** "is a load on the team and not contributed as much he contributed" in front of other class students. Further, **Defendant** Robert Ross, maliciously removed **Plaintiff**' name from a team submission. Further, during Term 4, while Plaintiff is talking to few WEMBA 2009 classmates about smoky mountains in the Carolina States, **Defendant** Robert Ross jumped into the conversation and stated that Plaintiff character itself is "Smokey".

x.    In October 2008, in the WEMBA 2009 class Halloween party, **Defendant** Jason Sundberg dressed like a "pimp" and ridiculed the **Plaintiff** that this character is suitable for the **Plaintiff** in his real life. In another occasion **Defendant** Jason Sundberg slander the **Plaintiff** that **Plaintiff** is in need of "pussies". In another occasion **Defendant** Jason Sundberg slander the **Plaintiff**, that **Plaintiff** "is not a capable person" in front of the other classmates. During Term 4, when Plaintiff and **Defendant** Jason Sundberg had to sit side by side in the United Airlines flight back to Philadelphia, **Defendant** Jason Sundberg told to the Plaintiff that he will win, because the Plaintiff is not working for any corporation.

xi.   During Term 3, one evening the **Plaintiff** is sitting in the R. David Thomas Center' bar, the **Defendant** Pradeep Rajagopal slander and ridiculed the **Plaintiff** as a "mother fucker". Further, instigated another student Ashish Chhabra to call the Plaintiff as "mother fucker" in Hindi.

xii.  **Defendant** Gregory Valentine, illegally obtained **Plaintiff**' medical records and made public to the class. Further, **Defendant** Gregory Valentine spread false rumor that **Plaintiff** is a Gay and take narcotic drugs and further suggested to sell the narcotic drugs to other students.  Further, **Defendant** Gregory Valentine ridicule **Plaintiff** about **Plaintiff**' examination performance in front of several other classmates as a 'B' student.

xiii. **Defendant** Sudheer Dharanikota slander against **Plaintiff** that **Plaintiff** "made a honor code complaint against another student", further threatened to kill the **Plaintiff**.

xiv.  **Defendant** Eugene White, threatened the **Plaintiff** that  he will "dig up the past of the **Plaintiff** and make it public".

xv.   **Defendant**  Alissandro R Castillo, slander against the **Plaintiff** that  he is using "Botox" to cover his age. Further, **Defendant**  Alissandro R Castillo made gestures that implying **Plaintiff** as a "trash" by tossing chewing gum wrap into a trash can in front of several classmates.

xvi.  **Defendant** Sunil Balasaheb Patil, during the second training camp at the TRIANGLE Training center, slander the Plaintiff  as "no value".

xvii. **Defendant** Moira Ringo and **Defendant** Jason C. Link together slander the Plaintiff that Plaintiff is "lying".

xviii.    **Defendant** Kristoffer S Singleton, during the break in the "Leadership Course", slander the Plaintiff is not even a "graphic artist" and "do not know the content". **Defendant** Kristoffer S Singleton falsely accused to school management that he saw a gun in the hands of the Plaintiff in the campus.

xix.    **Defendant** Peter M Walton, slander the Plaintiff that Plaintiff is a "3rd class student" in front of the classmates.

xx.    **Defendant**   John H Dohnal and **Defendant** Seth M. Gillespie slander the Plaintiff that Plaintiff is "lying and that is why his lips are trembling".

xxi.    **Defendant** Johnny A Williams, during class breaks, several times ridiculed the Plaintiff, that Plaintiff "he is acting up again".

xxii.    Unknown **Defendant** made malicious, false and slanderous accusation against **Plaintiff** that **Plaintiff** carrying a gun to the school.

xxiii.    Unknown **Defendant** spread false rumor about **Plaintiff** that **Plaintiff** declaring bankruptcy and **Plaintiff** is about to sell his wrist watch to a pawn broker.

100.    **Defendants** did slander the **Plaintiff** to Professors and other students in the class on several occasions between the dates of March 2008, and November 2009, with intent to destroy **Plaintiff**'s credibility and reputation. Further,  **Defendant**s vitiated the atmosphere in the school, such that **Plaintiff** should not attend the school' social gatherings where the consulting and business opportunities advertized by the school. On several occasions **Defendant** students informed the **Plaintiff** that they will continue to spread the rumors through word of mouth about the **Plaintiff**.

### SLANDER AND LIBEL AGAINST THE PLAINTIFF BY THE STUDENTS:

101.    On 15th September 2008, **Plaintiff** communicated with Guru Sarma as follows: {"Guru Sarma, You have asked me not to post any comments on the bulletin boards. Do you know that it is offensive? It is my right to express and communicate with

fellow students. This is not the first time you passed comments at me ( and you know that). Alternatively, do you want me to remind you the situations? Why did you do that?"}

102.     On 15th September 2008, Guru Sarma responded to **Plaintiff** as follows:  {"Vamsi, I am totally sorry.  I never said dont post any.  I said spare us from the ton of messages.  Cmon man, there was a period earlier this term, when the # of messages just went up sky rocketing and it was not possible to follow the various posts.   I am sorry that it was sounding offensive.  But it almost came across as if you had all the time to post, while many or at least I found it even difficult to read post (forget about writing any).  It would have been easy from your perspective when you get involved with the posts, but it becomes difficult to follow every message on the boards amidst of the crunching assignments and exams. We may very well be partners in the next term.  You never know.  But I should have been more clear and not jovial about it.  Where else did I say this apart from this weekend?  I did mention in the computing lounge if there is a way to rank the various messages so that I could make use of the ranking done by a majority of the classmates, rather than just by the # of posts in a thread.  But that was a constructive tool addition for everyone. It is not singled out against you. Okay if there has been any other comments made by me let me know.  It takes a strong character to come out and open up with me directly.  I am sorry and would like to maintain good terms with you. Guru."}

103.     On 28th July 2008, **Plaintiff** communicated with Rick Weiss as follows: {"Rick, It looks like you have an issue with me. I did observed that you are trying to ridicule or undermine me.  I would like to make some things clear with you. Let me know when would be good time for you to talk to me?"}

104.     On 29th July 2008, Rick Weiss responded to **Plaintiff** with as follows: {"Vamsi, I'm not sure where you got that idea from, but maybe that's part of the problem.  I'll be around fuqua all day today and I'll be more than happy to talk to you. Rick"}

105.     On 27th August 2008, Sreeedhar Manjigani communicated with **Plaintiff** as follows: {"Vamsi, How are you?  I need little help.  Since you know a lot about real estate, property values  etc. I thought of asking you. I am trying to finish my basement. I am planning to finish it without taking a permit from county.  The main reason is that once inspected, my property value is going to go up in books and I might have to shell out at least $2000 more per year. In your experience will this cause any problem, when I try to sell my house?  Either from county or someone else?  Or does the inspection done during selling covers these?  including code violations etc..? All the guys working are ok to do this and are licensed though, except for the drywall/paint guy.  Also few years back I have done some framing to hold drywall from a guy who is not licensed. I just don't want to open a can of worms, if i can avoid it. Regards, SM"}

106.     On 28th August 2008, **Plaintiff** responded to Sreeedhar Manjigani as follows: {"Sreedhar, Thank you for email and asking me for an opinion.  I never had an experience like this. My business advisers and accountant always suggests me to get a permit before starting a work. Architect, Plumber, Electrician need to be licensed, in order to pull the permit and perform the tasks, such as new pipe or line or new walls etc. Inspections required for every item/stage. Some items in the work like dry wall or painting can be completed by the owner.  In business  I need to avoid the avoidable risks. If I do not have a permit and something happened to the worker on the job site, then insurance companies have a chance to not to cover the costs."}

107.     On 1st June 2008, **Plaintiff** communicated with Douglas Bashar as follows: {" Dear Doug,  Your class discussion example about WL Gore & Associates guitar  strings is

informative. During the coffee break we have briefly discussed about the first sports ware company using   Gore-Tex.  Here is the URL  for interview with Columbia Sportswear              Chairman              Gert              Boyle. http://www.businessweek.com/smallbiz/content/apr2005/sb2005047_7032_sb038. htm. Do you have time to meet again when we are at Duke to hear more about  your experience and WL Gore & Associates?  --  Vamsidhar Vurimindi"}

108.   On 3rd June 2008, Douglas Bashar responded to **Plaintiff** as follows: {"Interesting article, she seems like she's been pretty successful. Columbia is a great company and their products are very well respected in the outdoor clothing industry. They are only one of many companies who we work with to provide material for their end products. I'd be happy to sit and talk more about Gore. Good Studying!! –Doug"}

109.   On 18th August 2008, Amit Khare communicated with **Plaintiff** as follows:  {" Subject: it is quality of money not the quantity of money. Hi Vamsi, I will send you more links but as an appetizer, I hope you have read or heard of Robert Kiyosaki."}

110.   On 19th August 2008, **Plaintiff** responded to Amit Khare as follows:  {" Amit, Thank you for the link. I did not get a chance to read the link. I will get back to you in 2-3 days time."}

111.   On 27th August 2008, Amit Khare communicated with **Plaintiff** as follows:  {"While I am still waiting for your comments. Here is another interesting read."}

112.   On 27th August 2008, **Plaintiff** responded to Amit Khare as follows:  {"Amit,  Thank you for sending me the email. I apologize for not getting back to you.  I am struggling to allocate time for the college reading and on-and-off  posting some comments on the school discussion board. I will respond to you during next week."}

113.    On 30th August 2008, Amit Khare responded to **Plaintiff** as follows: {"I hope you find time during the break."}

114.    On 30th August 2008, **Plaintiff** responded to Amit Khare as follows:{"Amit, I did not get a chance to read the articles. I have been very busy for the last four weeks. Please do not think that I have ignored your emails and understand my situation. As you might have noticed that I am not active now a days on notice boards also. I will get back to you when ever I have some time, may be after final exams."}

115.    On 13th September 2008, Amit Khare responded to **Plaintiff** as follows:{"OK, I look forward to the response after the final exams of this term."}

116.    On 20th September 2008, **Plaintiff** communicated with class through the message board as follows: {" I thought the data in excel sheet may be helpful for you.I am also soliciting the case solutions for graded class assignments (Talk  To Chuck, Callaway, FedEx, AA etc) from other teams.  I thought we all might benefit from seeing a different perspective. Are you interested in seeing how others approached the cases?  If so talk to your team and with their permission please posts the solutions to the bulletin board."}

117.    On 21st September 2008, Amit Khare responded to **Plaintiff** as follows: {"I hope you asked Prof. Carlson about this, I know he mentioned that we can discuss this particular case, I do not recall he mentioned that we can share the previous cases with each other."}

118.    On 21st July 2008, Amit Khare communicated with **Plaintiff** as follows: {"Subject: Re: Health Plan.. holy cow, you didn't expect us to read all that, did you ? btw, it's a fantastic way to kill a thread. just kidding."}

119.     On 21st July 2009, **Plaintiff** responded to Amit Khare as follows: {"Amit, Thank you for your email. I thought that people who are not in HSM and really interested to know the quick facts about the healthcare system would read. At the same time, I am also benefiting through contribution to the board in terms of gaining clarity and improving my perceptions about the concepts of healthcare policy."}

120.     On 21st July 2009, Amit Khare responded to **Plaintiff** as follows: {"Point I was trying to make was, writing such long long long emails kills interest of others (and eventually kills a good thread)"}

121.     On 21st July 2009, **Plaintiff** responded to Amit Khare as follows: {"Amit, Thank you for making a point, but I disagree with you. I think that people are not contributing to this thread is that they are busy with other work, don't have time to respond etc., What is going on at your end? Is everything OK with you? "}

122.     On 28th July 2008, Seth Gillespie responded to **Plaintiff** as follows: {" Vamsi, As a student and classmate to both you and James, I guess I find your demeanour in reply a little disrespectful and it concerns me.  We are all paying a lot of money to attain a Duke MBA...relying on that brand to open some doors and create opportunities (we are all capable walking through most of those open doors).  What bothers or concerns me, is that James and your anonymous friend offered some pretty good constructive feedback on a communication style that they disagreed with.  That doesn't mean that you were wrong, but in a "perception is reality" world, I feel that unless you believe you know everything, it may be prudent for you to be willing to take advice...especially from peers every bit as talented and capable as yourself.  Further, to throw around your ventures as some sort of license to disrespect or belittle people (e.g. pigeons), REALLY bothers me.  This is no different than if you enter a meeting 2 years from now and start trying to impose yourself on the room with "as a successful Duke MBA...".  That sort of attitude violently erodes both your

own personal brand, but, more importantly, it erodes our shared Duke brand and image. As a successful entrepreneur, surely you of all people understand how powerful 'word of mouth' can be in creating or destroying value. It is to this business sense that I appeal to when I ask for more general patience, respect, and humbleness in your public word. You are very bright and throw yourself into things like these forum posts, and I'm sure you do the same for your assignments as well...but if you feel you don't have anything to learn from your classmates and the process...why are you here? Just my two cents. I've never started a business, have no marked success in business, or any unusual talents -- so, take them for what they're worth. –Seth"}

123.   On 28th July 2008, **Plaintiff** responded to Seth Gillespie as follows: {"Dear Seth Gillespie, Thank you for your reply. Your reply is more of a threat than conciliatory. I didn't see that "my anonymous friend's" suggestion as constructive feedback and I perceived it as "ridiculing". If I think I know everything, why should I even bother to expose myself to this grueling and strenuous process to read and learn the course material? Regarding respect for the people: Probably you don't know much about me. Ever since my teenage I realized my responsibility towards this world and never disrespected anyone, moreover fought for the rights and affirmative actions for the underprivileged people of my country and experienced and exposed to the union and state governments power of iron heels. I invested my hard earned money in the blighted areas of the Philadelphia and hired people who can't speak English, not to exploit them but to provide an opportunity and a chance to succeed, and even paid 5% more to them. Please take a note that everyone is equally has access to the weapon "Word of Mouth" and don't even bother about my brand. I "walk my talk" and as long as I continue to do "walk my talk" I don't care how big and powerful one's mouth is. Regarding shared brand value: Only time will tell who will add value or take a free ride in the pretext that they have paid the school fee. See who is talking about the demeanor. Did you forget how you grilled me in the first term

when we sit in the Thomas Center Lounge along with Sanjay Mishra, John Dohnal and Ann Picinotti?  "See how his lips are trembling" -- did this ring the bell? Do you want me to elaborate?  I don't want your two cents, keep yourself."}

124.   On 28th July 2008, Seth Gillespie responded to **Plaintiff** as follows: {" Vamsi, There was nothing threatening in my reply.  It is a reply of someone that wants the best for his investment.  Seeing that you are part of this organization, I am only trying to help you understand how I saw the discussion.  I am sorry you feel threatened by someone else's point of view or feedback -- unrequested as it may have been. You're right that I don't know much about you.  I applaud any efforts you've made to improve the world and society at large around you. I don't care if you elaborate on whatever conversation you are referring to when you say that I was part of a group that grilled you.  I have never grilled you, in fact, this is the first time you and I have had any meaningful interaction besides cordial greetings in passing. I'm not going to reply anymore to this thread regardless of what's said.  If you want to chat some next time we're at school, let's have a beer and try to understand one another a bit better.  Sometimes intent is lost in written communication -- in no way am I (or anyone else that I can tell) trying to antagonize, threaten, insult, or escalate this situation.  Let's enjoy the next couple of weeks and hit term 6 strong :) Cheers, - Seth"}

125.   On 28th July 2008, Tony Gaidhane responded to **Plaintiff** as follows: {"Seth - I disagree.  You are a threat and a borderline antagonizer without footwear in class.  What part of foot(?)wear(?) do you not understand?  Footwear = wear on your feet.  Please follow directions accordingly.  I'm sure Booz clients don't have to go thru this unpleasantness, so why should we?  Respect the Fuqua brand and wear footwear in class. Also I consider it an insult when you mess with my water bottles and place them upside down every time you walk by.  So are you buying the beer or what?"}

126.    On 28th July 2008, Seth Gillespie responded to **Plaintiff** as follows: {" hey tony, fuck you."}

127.    On 28th July 2008, Jason Tan responded to **Plaintiff** as follows: {" Finally,  a post that is concise and to the point.  Well done Mr Gillespie, well done."}

128.    On 28th July 2008, Sanjay Mishra responded to **Plaintiff** as follows: {"Screw the health plan, Ramesh is buying the first round of drinks at the Thomas Center. Cheers!"}

129.    On 29th May 2009, Kristoffer Singleton responded to **Plaintiff** as follows:  {" But you have to agree, the next time you need a method to conceal a homemade weapon in prison or otherwise, you will think first of the Secret. I for one do not find the review depressing, but a testement to  the enduring power of the human spirit.  I am sure that in the end it was difficult for the writer to "quit" Marcus and rectify his violent gesture, however I am sure that there was a happy ending somehow.  Maybe this will also increase the sales of complement goods, for example toothbrushes (shivs) and small concealable pocket knives? Antidepressants? Brokeback mountain DVDs? Protection services? Again, please remember that the intent of the review was only as a joke; to entertain not depress. Maybe some of the humor was lost in translation. Also a good movie starring Bill Murray. Also ghost busters and stripes and caddy shack. "}

130.    On 30th May 2009, Deep Rajagopal responded to **Plaintiff** as follows: {" I am going to make a PDF of this thread. That way I can save it for a long time. I might need therapy but it was worth it. It might take me years to understand what the hell happened. Captain is speechless. All he can say is "favorite thread"  BTW - anyone know the nearest mailbox? I need to drop a deuce."}

131.   On 30th May 2009, **Plaintiff** responded to Deep Rajagopal as follows: {"Deep, Can you do me a favor? If you make this thread into a PDF, Can you please send me a copy, so that I will also store it for long time? BTW: The route to the nearest mail box is:  Go exactly north where ever you are for 500 yards and turn 90 degree left and go for 500 yards and turn 90 degree left and go for 500 yards and turn 90 degree left and go for 500 yards and turn 90 degree left and go for 500 yards, you will reach the mail box.  Scott, how are you feeling after the change? Is that good or bad?  BTW, 33% of US population believed that the verdict of 4th November 2008 changed their lives for better. What is the reason for the delay and it happened now May 2009? Just a good change is not sufficient, one need to reach an enlightened stage. I guess the limitations of the school setting like rules, regulations and hypocrisy, is stopping us to reach enlightenment in life. Any way let us change the rules and regulations of the "Gladiator_ Lair" and start having a debate about the Human Nature so that it will make a real change in life. Consider the following important topics....(1) Maitrayana- Brahmana Upanishad, (2) Mencius theory about the human nature, " the tendency of the human nature to good, just like water flow from top to down"(3) Hun Tzu's theory about human nature, "Human's nature is evil, goodness is the result of conscious activity"(4) Thomas Hobbes - theory about human nature, "the natural state of humanity is war" means a struggle between the conflicts of interests between each other person's interests(5) Sigmund Fred's - the drama of the human mind - Id, Superego and Ego (6) Hammurabi's Code (7) Law of Moses - Eye for Eye, Teeth for Teeth(8) Agganna Sutta - Gautama Buddha's social contract theory (9) Prince Shotoko - 17 Articles of Constitution  (10) Christine's - City of the ladies, Letter to the God of Love. And open to any other topics on "Law and Government", "War and Peace", "Wealth and poverty", "Science and Nature" ..What does "Gladiator Lair" think?  Please respond.. "}

**IRREPARABLE LOSS AND DAMAGE SUFFERED BY PLAINTIFF DUE TO THE DEFENDANTS ACTIONS IN PENNSYLVANIA:**

132. Fuqua School of Business, Duke University provided several software tools to continue the collaborative interaction between the students and professors, while the Plaintiff is in Pennsylvania. Plaintiff had numerous interactions with the Fuqua School of Business, Duke University professors, while the Plaintiff resided in Pennsylvania. Further, Fuqua School of Business, Duke University conducted their classes in Washington, DC and in China for the WEMBA 2009 class students. Whereas, various schools of Duke University conducted their classes in Pennsylvania and specifically provided corporate training for some Pennsylvania corporations. Further, Fuqua School of Business, Duke University' WEMBA 2009 class course format is specifically targeted to attract the students from various parts of the USA. Further, Fuqua School of Business, Duke University' WEMBA 2009 class course format is specifically targeted to attract the students from various parts of the USA. Further, Fuqua School of Business, Duke University' MBA course formats are specifically targeted to attract the students from various parts of the world. Further, Fuqua School of Business, Duke University have mailed the letter of acceptance, tuition invoices, and course materials to the Plaintiff' residential address in Pennsylvania. Further, Fuqua School of Business, Duke University administration had numerous interactions with Plaintiff through telephone and email when the Plaintiff resided in Pennsylvania. Further, Fuqua School of Business, Duke University, recruit several students into their various academic programs from Pennsylvania. Specifically, there are three (3) Pennsylvania residents were recruited into the WEMBA 2009 class. Further, Fuqua School of Business, Duke University and various other schools of Duke University advertised in national news papers and they were circulated in Pennsylvania, which were intended to rise the Duke University' profile. Further, Fuqua School of Business, Duke University and various other schools of Duke University have associated and had business relationships with various Pennsylvania business corporations and individuals. Further, Fuqua School of Business, Duke University and various other schools of Duke University conducted various fundraising and recruitment activities, organize the Alumni Associations in

Pennsylvania, and various sports teams like lacrosse, basketball played several games Pennsylvania in which were intended to rise the Duke University' profile. Further, Fuqua School of Business, Duke University conduct caused harm to the Plaintiff in Pennsylvania. Further, Fuqua School of Business, Duke University introduced the Student Defendants to the Plaintiff and such Student Defendants harmful activities caused irreparable damage to the Plaintiff in Pennsylvania.

133.    The Student Defendants using the Duke Graduate Alumni Network and their respective undergraduate school networks, professional school networks and their employer networks, slander the Plaintiff in Philadelphia through "word of mouth". In fact the Defendant Seth Gillespie threatened in one of his blog posting that the Students Defendants use the "word of mouth" to slander the Plaintiff and in truth the Students Defendants implemented the strategy of "word of mouth" in and around Philadelphia. Specifically, the Students Defendants using the school and their employer networks in Pennsylvania spread rumors about **Plaintiff** education credentials, economic and marital status. Specifically, the intensity of the slander is very high where Plaintiff' presence is more frequent to the neighborhood shops, like Starbuck' coffee shop, Café Ole Coffee shop, Moko Hair salon, Charlie' Pub, Race Street Pub etc. Further, the **Student Defendants** slander the **Plaintiff** among the Plaintiff' real estate business network like real estate agents, brokers and other Real Estate Developers. Further, the **Student Defendants** are in constant touch with the Plaintiff' colleagues at Wyeth Pharmaceuticals and exchange information about Plaintiff' reaction to the Student Defendants slander at Fuqua School of Business Campus and other forums. Due to the intensive, concerted and premeditated slander by the Student Defendants, Plaintiff lost his consulting opportunity in March 2009 and Plaintiff could not able to muster the support of the financial institutions for the furtherance of the Plaintiff' business.

**(IV)**   <u>**GENERAL ALLEGATIONS**</u>

134.   This matter presents common questions of law and fact arising out of the slander against the **Plaintiff** that predominate over individual questions. Among the numerous predominating questions of law and fact are:

i).   The origin for the slander against the **Plaintiff**;

ii).   The cause for the slander against the **Plaintiff**;

iii).   The origin for the sustained damages to **Plaintiff**;

iv).   The cause for the sustained financial loss to **Plaintiff**;

v).   Whether the **Defendants** slander against the **Plaintiff;**

vi).   Whether the **Defendants** failed to behave like a normal and reasonable person;

vii).   Whether the **Defendants** make it impossible for the **Plaintiff** to learn and cultivate new relationships among the student body;

viii).   Whether the **Defendants** make it known that there is an intention to harm the **Plaintiff** ;

ix).   Whether the **Defendants** failed to, among other things, to **properly adhere** to the requirements of federal and state privacy and public safety laws and standards;

x).   Whether the **Defendants** failed to, among other things, to **properly enforce** the requirements of federal and state privacy and public safety laws and standards;

xi).   Whether **Defendants** knew or should have known that the failure among other things, to **properly adhere** to the requirements of applicable federal and state privacy and public safety laws and standards, could cause grave and extensive harm to the **Plaintiff**.

xii).   Whether **Defendants** knew or should have known that the failure among other things, to **properly enforce** the requirements of applicable federal

and state privacy and public safety laws and standards, could cause grave and extensive harm to the **Plaintiff**.

xiii). Whether **Defendants** alleged failure to, among other things, to **properly adhere** to the requirements of applicable federal and state privacy and public safety laws and standards, caused and contributed to the grave and extensive harm to the **Plaintiff**.

xiv). Whether **Defendants** alleged failure to, among other things, to **properly enforce** the requirements of applicable federal and state privacy and public safety laws and standards, caused and contributed to the grave and extensive harm to the **Plaintiff**.

xv). Whether the **Plaintiff** suffered damages as a result of **Defendants** conduct;

xvi). Whether **Defendants** are liable to the **Plaintiff** for the harm **Plaintiff** suffered;

xvii). Whether **Defendants** acted outrageously or with reckless indifference to the rights of others in failing to among other things, to **properly adhere** to the requirements applicable federal and state privacy and public safety laws and standards;

xviii). Whether **Defendants** acted outrageously or with reckless indifference to the rights of others in failing to among other things, to **properly enforce** the requirements applicable federal and state privacy and public safety laws and standards;

## (V)   FIRST CAUSE OF ACTION – BREACH OF CONTRACT AGAINST FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY:

135.   **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

136.    As per common law duty, the Student Defendants should not engage in a behavior that threaten or endangers the safety, physical or mental health, or life of The Plaintiff, or creates a reasonable fear of such action, whether intentionally or as a result of recklessness or gross negligence. Further, the Student Defendants should not engage in stalking in a pattern of unwanted conduct directed at Plaintiff that threatens or endangers the safety, physical or mental health, or life or property of Plaintiff, or creates a reasonable fear of such a threat or action. Further, the Student Defendants should not engage in dishonest conduct including, but not limited to, knowingly reporting a false emergency; knowingly making false accusation of misconduct;  Further, the Student Defendants should not record the images of the Plaintiff without Plaintiff' Knowledge, using electronic or other means to make a video or photographic record of any person in a location where there is a reasonable expectation of privacy without the person's prior knowledge, when such a recording is likely to cause injury, distress, or damage to reputation. This includes, but is not limited to, taking video or photographic images in class rooms, shower/locker rooms, residence hall rooms, and restrooms. Further, the Student Defendants should not store, share, distribute of such unauthorized images by any means. However, the Student Defendants actively engaged in the above described prohibited behavior.

137.    Fuqua School of Business, Duke University made an agreement with **Plaintiff** to create an equal learning opportunity and facilitate to foster new relationships to the **Plaintiff**. Further, Fuqua School of Business, Duke University has discretionary power to prevent the Student Defendants from being actively engaged in the above described behavior. However, Fuqua School of Business was lenient towards **Student Defendants** and such lenience provided ample encouragement to the **Student Defendants** to engage in the prohibited behavior.

138.   **Plaintiff**   paid $110,000 as school tuition fee, incurred $20,000 for travel and accommodation and lost an income of $130,000 to attend the Fuqua School of Business. Fuqua School of Business, Duke University breached the contract by not creating an equal learning opportunity and facilitate to foster new relationships to the **Plaintiff**.   Fuqua School of Business, Duke University committed a material breach of contract and failed to perform as promised and Fuqua School of Business making it known there is an intention not to perform.

139.   By the reason of material breach of contract by Fuqua School of Business, Duke University, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings. The time and money spent to attend the Fuqua School of Business is of no use to the **Plaintiff**. The actual damage in the total amount of $250,000. Therefore, given that, the Fuqua School of Business, Duke University breached the contract and such material breach was the proximate cause of damage to the **Plaintiff**.

140.   Because, Fuqua School of Business, Duke University material breach was reckless disregard to the safety and financial wellbeing of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

141.   WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against Fuqua School of Business' in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

(VI)    **SECOND CAUSE OF ACTION – AIDING AND ABETTING AGAINST FUQUA
SCHOOL OF BUSINESS, DUKE UNIVERSITY:**

142.    **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134
of this Complaint the same as if fully set forth hereinafter.

143.    As per common law duty, the Student Defendants should not engage in a behavior
that threaten or endangers the safety, physical or mental health, or life of The
Plaintiff, or creates a reasonable fear of such action, whether intentionally or as a
result of recklessness or gross negligence. Further, the Student Defendants should
not engage in stalking in a pattern of unwanted conduct directed at Plaintiff that
threatens or endangers the safety, physical or mental health, or life or property of
Plaintiff, or creates a reasonable fear of such a threat or action. Further, the Student
Defendants should not engage in dishonest conduct including, but not limited to,
knowingly reporting a false emergency; knowingly making false accusation of
misconduct;  Further, the Student Defendants should not record the images of the
Plaintiff without Plaintiff' Knowledge, using electronic or other means to make a
video or photographic record of any person in a location where there is a reasonable
expectation of privacy without the person's prior knowledge, when such a recording
is likely to cause injury, distress, or damage to reputation. This includes, but is not
limited to, taking video or photographic images in class rooms, shower/locker
rooms, residence hall rooms, and restrooms. Further, the Student Defendants
should not store, share, distribute of such unauthorized images by any means.
Further, the **Student Defendants** owed a fiduciary duty to the **Plaintiff**, because,
**Plaintiff** learning experience depending upon the trust, confidence and reliance
between **Student Defendants,** Non-Defendants students and **Plaintiff**, because the
**Student Defendants** together holds a position of dominance over the **Plaintiff.**

144.    Fuqua School of Business, Duke University fully aware that the **Student Defendants**
together owed a fiduciary duty to the Plaintiff, and aware that the Student

Defendants actively engaged in the above described prohibited behavior and further aware that the **Student Defendants** breached their fiduciary duty to the **Plaintiff.** However, Fuqua School of Business, Duke University provided substantial assistance to the breach of duty to **Plaintiff** by the **Student Defendants** by being lenient towards the **Student Defendants** and not insisting the **Student Defendants** to abide the Fuqua School of Business, Duke University' code and conduct. Further, Fuqua School of Business, Duke University did not take any action against the **Student Defendants** even after Plaintiff made several oral and written complaints against the **Student Defendants** .

145.  Hence, Fuqua School of Business aided and abetted the **Student Defendants** to breach their duty to **Plaintiff**. Fuqua School of Business was lenient to **Student Defendants** with an intention to assist **Student Defendants** to breach their duty to **Plaintiff**. Fuqua School of Business was lenient to **Student Defendants** to breach the duty to **Plaintiff**. **Student Defendants** breached the duty to **Plaintiff** with the help of Fuqua School of Business. As a result, **Plaintiff** sustained injuries from the tortious conduct of Fuqua School of Business.

146.  Because of the Fuqua School of Business aided and abetted the breach of the duty by **Student Defendants** to breach their duty to **Plaintiff** by being lenient to **Student Defendants**, **Plaintiff** was deprived from equal learning opportunity and suffered loss of reputation, shame, mortification, and injury to Plaintiff' feelings. The time and money spent to attend the Fuqua School of Business is of no use to the **Plaintiff**, because Plaintiff could not able to foster new relationships in an hostile environment. The actual damage in the total amount of $250,000.

147.  By the reason of Fuqua School of Business, Duke University' aiding, abetting and lenient to the breach of the duty by **Student Defendants** to the **Plaintiff**, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings.

The time and money spent to attend the Fuqua School of Business, Duke University is of no use to the **Plaintiff**. The actual damage in the total amount of $250,000.

148.   Because, Fuqua School of Business, Duke University aided, abetted and lenient to the breach the duty to **Plaintiff** by **Student Defendants**  was wanton, willful and in reckless disregard for the safety and financial wellbeing of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

149.   WHEREFORE, given that, the Fuqua School of Business, Duke University' aiding and abetting the breach the duty by **Student Defendants** to breach their duty to **Plaintiff** was the proximate cause of damage to the **Plaintiff**, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against Fuqua School of Business' in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

## (VII)   THIRDS CAUSE OF ACTION – FRAUD AND MISREPRESENTATION AGAINST FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY:

150.   Plaintiff incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

151.   Fuqua School of Business, Duke University made a false representation about their intentions against the Plaintiff, by making bogus promise that they will provide an equal learning opportunity  and provide an opportunity to foster new relationships to the Plaintiff. However Fuqua School of Business, Duke University was aware that they don't want to provide an equal learning opportunity  and provide an opportunity to foster new relationships to the Plaintiff.

152.   Fuqua School of Business, Duke University made false representation about their intentions against the Plaintiff with intent to induce the **Plaintiff** to rely upon it. **Plaintiff** believed the Fuqua School of Business, Duke University misrepresentation about their intentions against the Plaintiff and relied on it.

153.   Because of the reliance on Fuqua School of Business, Duke University' false representation about their intentions against the Plaintiff, **Plaintiff** was deprived from an equal learning opportunity and could not foster new relationships with the student body. Further, Plaintiff suffered loss of reputation, shame, mortification, and injury to his feelings.

154.   By the reason of Fraudulent Misrepresentation by Fuqua School of Business, Duke University, **Plaintiff** was deprived from an equal learning opportunity and could not foster new relationships with the student body. Therefore, given that, the by Fuqua School of Business, Duke University' Fraudulent Misrepresentation was the proximate cause of damage to the **Plaintiff**.

155.   Because**,** Fuqua School of Business, Duke University' Fraudulent Misrepresentation was wanton, willful and in reckless disregard for the safety and financial wellbeing of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

156.   WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against Fuqua School of Business, Duke University in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

**(VIII)**   **FIFTH CAUSE OF ACTION – INVASION OF PRIVACY AGAINST  FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY:**

157.   **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

158.   Fuqua School of Business, Duke University intruded upon the Plaintiff by secluding the Plaintiff among the rest of the student body. Further, Fuqua School of Business, Duke University gave publicity to Plaintiff' private life, and such publicity placed the Plaintiff in a false light among the other students at Fuqua School of Business.

159.   Fuqua School of Business, Duke University used the information from the Plaintiff' background search conducted by Duke University Police on behalf of Fuqua School of Business, Duke University and illegally released the confidential information along with some made-up stories among the Fuqua School of Business Student Body and in and around Plaintiff' residence. Further, Fuqua School of Business, Duke University reached out  to the small retail business like pub', coffee shops and hair salons in and around Plaintiff' residence and gave publicity to Plaintiff' private life.

160.   By the reason of Fuqua School of Business, Duke University invaded the Plaintiff' privacy,  caused substantial damage to **Plaintiff** in loss of clients, income, good will, reputation, physical and mental suffering. Family members relying upon **Plaintiff** for nurture and support have also suffered damage.  Further, **Plaintiff** has suffered the deprivation of an equal learning opportunity and could not foster new relationships with the student body and loss of reputation, shame, mortification, and injury to his feelings. The actual damage in the total amount of $250,000. Therefore given that, the Fuqua School of Business, Duke University invasion of the privacy was the proximate cause of damage to the **Plaintiff**.

161.   Because, Fuqua School of Business, Duke University' invasion of the privacy was reckless disregard for the safety and financial wellbeing of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

162.   WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against Fuqua School of Business, Duke University in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

## (IX)   SIXTH CAUSE OF ACTION – CONSPIRACY TO INTERFERE WITH CIVIL RIGHT AGAINST FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY:

163.   **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

164.   Fuqua School of Business is part of the Duke University in Durham, North Carolina. Duke University is a federal contractor and recipient of federal funds. Hence, Duke University is subjected to laws and regulations set forth by the federal government. Per Equal Educational Opportunity Act (20 USC Sec. 1703), Fuqua School of Business is prohibited to deliberate segregation of the **Plaintiff**. However, Fuqua School of Business, Duke University marginalized and segregated the **Plaintiff** and specifically characterized the **Plaintiff** as a "risk", while several students publicly discussed about the guns that they own and the size of the bullets that they use and how recently that they fired the guns. Further, constantly monitored the **Plaintiff'** movements and Plaintiff' computer activity in the school by deploying shadow parties. Further, Duke University Police used that monitored information against the **Plaintiff** to trap the Plaintiff.

165.   Further, Fuqua School of Business, Duke University clearly exposed the **Plaintiff** to hatred, contempt, ridicule and created questions in the WEMBA 2009 classmates and potential prospective business client's mind. Fuqua School of Business, Duke University administration, Duke University Police and   **Student Defendants** conspired to prevent the Plaintiff by force, intimidation, and threat, from freely mingle or interact with the WEMBA 2009 classmates, whereby Plaintiff deprived from having and exercising the right to freely meet and mingle with the  WEMBA 2009 classmates.   As a result of the Fuqua School of Business, Duke University' marginalization, segregation, and isolation of the Plaintiff from the rest of the class by deploying shadow people all the time, Plaintiff could not mingle with the WEMBA 2009 classmates freely. Further, **Plaintiff** suffered loss of his reputation, shame, mortification, and injury to his feelings. Further, **Plaintiff** was terrified, deprived of the sleep, suffered from reduced metabolic activity and as a result, **Plaintiff** gained 17 pounds body weight and now facing the consequences of being overweight. Fuqua School of Business, Duke University did not monitored and characterized any other WEMBA 2009 classmate, it did to the Plaintiff.

166.   As a proximate result of the above described marginalization, segregation and isolation, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings. The time and money spent to attend the Fuqua School of Business is of no use to the **Plaintiff**. Plaintiff incurred $250,000 direct expenses for attending the Fuqua School of Business. The actual damage in monetary terms of is much more than the actual cost of attending the Fuqua School of Business.

167.   By the aforementioned Fuqua School of Business' outrageous conduct, carelessness and reckless indifference to the rights of the **Plaintiff,  Plaintiff** suffered a loss and damage. Therefore given that the Fuqua School of Business' conspiracy to interfere with civil rights of **Plaintiff** was the proximate cause of damage to the **Plaintiff**.

168.     Because**,** Fuqua School of Business' conspiracy to interfere with civil rights of **Plaintiff** was reckless disregard for the safety of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

169.     WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against Fuqua School of Business, Duke University in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

## (X)   SEVENTH CAUSE OF ACTION – CONSPIRACY AGAINST RIGHTS OF CITIZENS AGAINST FUQUA SCHOOL OF BUSINESS, DUKE UNIVERSITY:

170.     **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

171.     Fuqua School of Business is part of the Duke University in Durham, North Carolina. Duke University is a federal contractor and recipient of federal funds. Hence, Duke University is subjected to laws and regulations set forth by the federal government. Per Equal Educational Opportunity Act (20 USC Sec. 1703), Fuqua School of Business is prohibited to deliberate segregation of the **Plaintiff**. However, Fuqua School of Business, Duke University marginalized and segregated the **Plaintiff** and specifically characterized the **Plaintiff** as a "risk", while several students publicly discussed about the guns that they own and the size of the bullets that they use and how recently that they fired the guns. Further, constantly monitored the **Plaintiff'** movements and Plaintiff' computer activity in the school by deploying shadow parties. Further, Duke University Police used that monitored information against the **Plaintiff** to trap the Plaintiff.

172.    Further, Fuqua School of Business, Duke University clearly exposed the **Plaintiff** to hatred, contempt, ridicule and created questions in the WEMBA 2009 classmates and potential prospective business client's mind. Fuqua School of Business, Duke University administration, Duke University Police  and Student Defendants conspire to injure, oppress, threaten, and intimidate the Plaintiff from the  enjoyment of any right or privilege secured to Plaintiff by the Constitution or laws of the United States.

173.    As a proximate result of the above described marginalization and segregation, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings. The time and money spent to attend the Fuqua School of Business is of no use to the **Plaintiff**. The actual damage in the total amount of $250,000.

174.    By the aforementioned Fuqua School of Business' outrageous conduct, carelessness and reckless indifference to the rights of the **Plaintiff,  Plaintiff** suffered a loss and damage. Therefore, given that the Fuqua School of Business' conspiracy to interfere with civil rights of **Plaintiff** was the proximate cause of damage to the **Plaintiff**.

175.    Because**,** Fuqua School of Business' conspiracy to interfere with civil rights of **Plaintiff** was wanton, willful and in reckless disregard for the safety of the neighbors, punitive damages should be awarded against it in an amount to be determined at trial.

176.    WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against Fuqua School of Business, Duke University in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

**(XI)**   **FIRST CAUSE OF ACTION – TORTIOUS / WRONGFUL INTERFERENCE AGAINST STUDENT DEFENDANTS:**

177.   **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

178.   **Plaintiff** and Fuqua School of Business had an economic relationship and containing 99.9% probability of future economic benefit to the **Plaintiff** from the education opportunity offered by the Fuqua School of Business. **Plaintiff** and Wyeth Pharmaceuticals had an economic relationship and containing 99.9% probability of future economic benefit to the **Plaintiff.  Plaintiff** and City of Philadelphia had an economic relationship and containing 99.9% probability of future economic benefit to the **Plaintiff.  Student Defendants** has the knowledge that **Plaintiff** and Fuqua School of Business had an economic relationship and such relationship is in existence. **Student Defendants** has the knowledge that **Plaintiff** and Wyeth Pharmaceuticals had an economic relationship and such relationship is in existence. **Student Defendants** has the knowledge that **Plaintiff** and City of Philadelphia had an economic relationship and such relationship is in existence.

179.   **Student Defendants** actions are intentional and designed to disrupt the relationship between **Plaintiff** and Fuqua School of Business;   **Plaintiff** and Wyeth Pharmaceuticals;  and **Plaintiff** and City of Philadelphia as follows:

   **(i)**   Making false allegations against **Plaintiff** and slander the **Plaintiff** to professors, caused Fuqua School of Business notable provide an equal learning opportunity to the Plaintiff.

   **(ii)**   Slander the Plaintiff in the Fuqua School of Business' social events, Fuqua School of Business could not able to create an environment that foster new relationships to the Plaintiff among the student body and subsequently to the valuable business opportunities.

**(iii)**      Co-operating with few disgruntled Wyeth Pharmaceutical employees and slander the Plaintiff in and outside of Fuqua School of Business campus, caused Plaintiff to distract from the work on hand and this subsequently lead to the termination of the consulting opportunity with Wyeth Pharmaceuticals.

**(iv)**      Slander the Plaintiff to the City of Philadelphia employees about Plaintiff' education, economic and marital relationship, City of Philadelphia dodging to sell the vacant lots that Plaintiff identified by incurring lot of money and time.

180.    **Student Defendants'** intentional acts caused Fuqua School of Business, Duke University not to provide an equal learning opportunity to the Plaintiff and not able to create an environment that foster new relationships to the Plaintiff among the student body and subsequently to the valuable business opportunities. Further, **Student Defendants'** intentional acts caused Wyeth Pharmaceuticals to terminate the contract with Plaintiff, and subsequently P**laintiff** suffer a loss of job, suffered loss of pay, loss of reputation, shame, mortification, and injury to his feelings. Further, **Student Defendants'** intentional acts caused City of Philadelphia to dodge to sell the vacant lots that Plaintiff identified by incurring lot of money and time and as result Plaintiff is suffering from Business continuity losses. The above explained three incidents are disruption to the economic relationship.

181.    By the reason of Tortious / Wrongful Interference (in business relationship) by **Student Defendants**, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings. The time and money spent to attend the Fuqua School of Business is of no use to the **Plaintiff**. The actual damage in the total amount of $250,000.

182. By the reason that, the **Student Defendants** Tortiously / wrongfully interfered between **Plaintiff**' business relationship with Fuqua School of Business and such Tortious / Wrongful Interference was the proximate cause of damage to the **Plaintiff**.

183. Because, **Student Defendants** Tortious / Wrongful Interference was wanton, willful and in reckless disregard for the safety and financial wellbeing of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

184. WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff**' favor and against **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Shana Keating, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, David R Mitchell, and Pradeep Rajagopal in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

## (XII)   SECOND CAUSE OF ACTION – SLANDER AGAINST STUDENT DEFENDANTS:

185. **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

186. Defendants slander and libel are not protected or privileged speech. Test articulated for evaluating when speech is protected opinion: (1) The statement complained of

should be examined to determine if it is cautiously phrased in terms of appearance, e.g., "in my opinion"; (2) the entire published statement must be examined in context, not just the objectionable word or phrase; and (3) all the circumstances surrounding the statement, including the medium of dissemination and the audience to whom it is directed, should be considered.

187.    Due to the repeated slanders, libel, and the malice evinced by the continuing pattern of actions in conspiracy with Fuqua School of Business, and due to their negligent, reckless, and tortious activities of harassment and intimidation, **Plaintiff** will seek punitive and exemplary damages in addition to direct damages. Their actions have caused overwhelming and substantial damage to **Plaintiff** in loss of clients, income, good will, reputation, physical and mental suffering. Family members relying upon **Plaintiff** for nurture and support have also suffered damage. On further information and belief, it appears that the **Student Defendants** has been financed, controlled and encouraged by third party presently unknown, to engage in and provide an enterprise for negligent, reckless, and tortious activities. These include harassment and intimidation of **Plaintiff** and associated persons. AS a result, **Plaintiff**, has sustained a great financial loss in the year 2008 and 2009, in the amount exceeding $250,000 and **Plaintiff** alleges that such losses are due to the slanderous activities of the **Student Defendants**.

188.    As a proximate result of the above described slander, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings, all to his damage in the total amount of $250,000. Therefore this action is brought in district court, a total amount to be established by proof at trial.

189.    By the reason of Slander by **Student Defendants**, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings. The time and money spent to attend the Fuqua School of Business is of no use to the **Plaintiff**. The actual damage in the total amount of $250,000. Further,  the **Student Defendants'** slander was the proximate cause of damage to the **Plaintiff**.

190.    Because, **Student Defendants'** slander  was wanton, willful and in reckless disregard for the safety and financial wellbeing of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

191.    WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Shana Keating, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, David R Mitchell, and Pradeep Rajagopal in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

## (XIII)   THIRD CAUSE OF ACTION – INVASION OF PRIVACY AGAINST  STUDENT DEFENDANTS:

192.    **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

193.    **Student Defendants** intruded upon the Plaintiff by secluding the Plaintiff among the rest of the student body. Further, **Student Defendants** gave publicity to Plaintiff'

private life, and such publicity placed the Plaintiff in a false light among the other students at Fuqua School of Business.

194.   **Student Defendants** obtained the information through the disgruntled Wyeth Pharmaceutical employees about the Plaintiff from the background search conducted by private agency on behalf of Wyeth Pharmaceuticals between November 2004 and March 2005 and between June 2007 and August 2007. **Student Defendants** illegally released the confidential information along with some made-up stories among the Fuqua School of Business Student Body and in and around Plaintiff' residence. Further, **Student Defendants** reached out to the small retail business like pub', coffee shops and hair salons in and around Plaintiff' residence and gave publicity to Plaintiff' private life.

195.   By the reason of **Student Defendants** invaded the Plaintiff' privacy, caused substantial damage to **Plaintiff** in loss of clients, income, good will, reputation, physical and mental suffering. Family members relying upon **Plaintiff** for nurture and support have also suffered damage. Further, **Plaintiff** has suffered the deprivation of an equal learning opportunity and could not foster new relationships with the student body and loss of reputation, shame, mortification, and injury to his feelings. The actual damage in the total amount of $250,000. Therefore given that, the **Student Defendants** invasion of the privacy was the proximate cause of damage to the **Plaintiff**.

196.   Because, **Student Defendants'** invasion of the privacy was reckless disregard for the safety and financial wellbeing of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

197.   WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against **Defendants** Douglas M Bashar, Alissandro R Castillo,

Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Shana Keating, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, David R Mitchell, and Pradeep Rajagopal in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

## (XIV)   FIRST CAUSE OF ACTION – VICARIOUS LIABILITY AGAINST CORPORATE DEFENDANTS:

198.   **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

199.   Defendant WL Gore & Associates employed and sponsored the Defendant Douglas M Bashar;  Defendant MD Laser Studio employed and sponsored the Defendant Defendant Alissandro R Castillo; Defendant Ferro Corporation employed and sponsored the Defendant Pratibhash Chattopadhyay; Defendant Alcatel-Lucent employed and sponsored the Defendant Sudheer Dharanikota; Defendant Talecris Biotherapeutics, Inc employed and sponsored the Defendant John H Dohnal; Defendant Dell Inc employed and sponsored the Defendant Jennifer E. Erickson; Defendant Booz Allen Hamilton employed and sponsored the Defendant Seth M. Gillespie; Defendant Health Port employed and sponsored the Defendant Rajiv Prasad Kolagani; Defendant Amgen Inc employed and sponsored the Defendant Amit Khare; Defendant Agilent Technologies employed and sponsored the Defendant Jason C. Link; Defendant Ericsson Inc employed and sponsored the Defendant Sunil Balasaheb Patil; Defendant GlaxoSmithKline employed and sponsored the Defendant Moira Ringo; Defendant Signalscape, Inc employed and

sponsored the Defendant Robert E Ross; Defendant Emergent Game Technologies employed and sponsored the Defendant Kristoffer S Singleton; Defendant Accenture employed and sponsored the Defendant Jason S Sundberg; Defendant Seegrid Corporation employed and sponsored the Defendant Gregory S Valentine; Defendant SunTrust Bank, Inc employed and sponsored the Defendant Peter M Walton; Defendant Smith Barney employed and sponsored the Defendant Johnny A Williams; Defendant Shaw Areva Mox Services employed and sponsored the Defendant Eugene White; Defendant Bank of America employed and sponsored the Defendant David R Mitchell as a student between March 2008 and November 2009 at Fuqua School of Business.

200.    **Corporate Defendants** sponsored the **Student Defendants** as students between March 2008 and November 2009 at Fuqua School of Business, in anticipating that the increased education being obtained by the **Student Defendants** certainly benefit the **Corporate Defendants. The Student Defendants** represented themselves as the representatives of the respective **Corporate Defendants** and defended their respective **Corporate Defendants** business domain in various class discussions and personal interactions with the Plaintiff and other WEMBA 2009 classmates. During the WEMBA 2009 class discussions and posting, **Plaintiff** constructively criticized various business practices of the **Corporate Defendants.** In response to the **Plaintiff'** constructive criticism, the **Student Defendants** stoop down to gang-up against the **Plaintiff** and slander the **Plaintiff.**

201.    The **Student Defendants** slander the Plaintiff through word of mouth where Plaintiff resides. The Student Defendants, using the alumni association contacts in Pennsylvania spread rumors about **Plaintiff** education credentials, economic and marital status. Due to the **Student Defendants** slander, Plaintiff lost his employment opportunity at Wyeth. Further, the **Student Defendants** reached out to the **Plaintiff'**

real estate broker and slander the **Plaintiff.** Further, the **Student Defendants'** slander don't constitute as privileged in an academic environment**.**

202.    **During** the work hours of **Corporate Defendants**, **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, and David R Mitchell slander the **Plaintiff.**

203.    **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, and David R Mitchell used **Corporate Defendants** facilities, systems and network to slander the **Plaintiff.   Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, and David R Mitchell communicated with students and professors at Fuqua School of Business using **Corporate Defendants** facilities.

204.    **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter

M Walton, Johnny A Williams, Eugene White, and David R Mitchell used **Corporate Defendants** goodwill and influence in the society to slander the Plaintiff.

205.    **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, and David R Mitchell was successful to forge new relationships with **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg, Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, and David R Mitchell to slander the Plaintiff.

206.    The **Student Defendants** slander lower the **Plaintiff'** reputation in the WEMBA 2009 class and Plaintiff' community and deterred others from dealing with **Plaintiff.**  The **Student Defendants** slander suggests undisclosed facts about **Plaintiff.**  As a result of the **Student Defendants** slander, school tuition fee   $110,000 paid to Fuqua School of Business, Duke University, the travel and accommodation expenses of $20,000 and lost income of $130,000 to attend the Fuqua School of Business, is of no use to the Plaintiff, because, **Plaintiff'** reputation in the WEMBA 2009 class and Plaintiff' community was lowered and subsequently deterred others from dealing with **Plaintiff.**

207.    By reason of that the **Corporate Defendants** employee in-person, on-campus, and online criminal acts, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings, all to his damage in the total amount of

$250,000. Therefore this action is brought in district court, a total amount to be established by proof at trial.

208. Because, the **Corporate Defendants** employees in-person, on-campus, and online criminal acts was the proximate cause of damage to the **Plaintiff**.

209. Because**, Corporate Defendants** employee criminal acts was wanton, willful and in reckless disregard for the safety of the neighbors, punitive damages should be awarded against it in an amount to be determined at trial.

210. Wherefore, the **Plaintiff**, Pro-Se prays for judgment against the **Defendants** Wl Gore & Associates, Md Laser Studio, Ferro Corporation, Alcatel-Lucent, Talecris Biotherapeutics,  Inc, Dell Inc, Booz Allen Hamilton, Health Port, Amgen Inc, Agilent Technologies, Bank Of America, Ericsson Inc, Glaxosmithkline, Signalscape,  Inc, Emergent Game Technologies, Accenture, Seegrid Corporation, Suntrust Bank,  Inc, Smith Barney, And Shaw Areva Mox Services' as shall be awarded by a jury for the slanderous and vexatious attacks on the **Plaintiff**, by the **Defendants** Douglas M Bashar, Alissandro R Castillo, Pratibhash Chattopadhyay, Sudheer Dharanikota, John H Dohnal, Jennifer E. Erickson, Seth M. Gillespie, Rajiv Prasad Kolagani, Amit Khare, Jason C. Link, Sunil Balasaheb Patil, Moira Ringo, Robert E Ross, Kristoffer S Singleton, Jason S Sundberg,  Gregory S Valentine, Peter M Walton, Johnny A Williams, Eugene White, and David R Mitchell in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.

(XV)   **SECOND CAUSE OF ACTION – CONSPIRACY TO INTERFERE WITH CIVIL RIGHT AGAINST CORPORATE DEFENDANTS;  FOURTH CAUSE OF ACTION – CONSPIRACY TO INTERFERE WITH CIVIL RIGHT AGAINST STUDENT DEFENDANTS:**

211.   **Plaintiff** incorporates herein by reference all preceding paragraphs 01 through 134 of this Complaint the same as if fully set forth hereinafter.

212.   As per Title 42, Chapter 21, Subchapter I § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges, Student Defendants and Corporate Defendants are not allowed to  conspire for the purpose of depriving, either directly or indirectly, Plaintiff' equal protection of the laws, equal privileges and immunities under the laws. However, Student Defendants and Corporate Defendants along with Fuqua School of Business, Duke University marginalized and segregated the **Plaintiff** and specifically characterized the **Plaintiff** as a "risk", while several Student Defendants publicly discussed about the guns that they own and the size of the bullets that they use and how recently that they fired the guns. Further, Student Defendants and Corporate Defendants persuaded the Fuqua School of Business, Duke University to constantly monitored the **Plaintiff'** movements and Plaintiff' computer activity in the school by deploying shadow parties. Further, Student Defendants and Corporate Defendants persuaded the Duke University Police to the information obtained from  monitoring the Plaintiff, to trap the Plaintiff.

213.   Further, Student Defendants and Corporate Defendants persuaded the Fuqua School of Business, Duke University to expose the **Plaintiff** to hatred, contempt, ridicule and created questions in the WEMBA 2009 classmates and potential prospective business client's mind. Further, Student Defendants and Corporate Defendants conspired with Fuqua School of Business, Duke University administration, and Duke University Police to prevent the Plaintiff by force, intimidation, and threat, from

freely mingle or interact with the WEMBA 2009 classmates, whereby Plaintiff deprived from having and exercising the right to freely meet and mingle with the WEMBA 2009 classmates.  As a result of the Student Defendants and Corporate Defendants persuasion to the Fuqua School of Business, Duke University to marginalize, segregate and isolate the Plaintiff from the rest of the class by deploying shadow people all the time, Plaintiff could not mingle with the WEMBA 2009 classmates freely. Further, **Plaintiff** suffered loss of his reputation, shame, mortification, and injury to his feelings. Further, **Plaintiff** was terrified, deprived of the sleep, suffered from reduced metabolic activity and as a result, **Plaintiff** gained 17 pounds body weight and now facing the consequences of being overweight.

214.   As a proximate result of the above described marginalization, segregation and isolation, **Plaintiff** has suffered loss of his reputation, shame, mortification, and injury to his feelings. The time and money spent to attend the Fuqua School of Business is of no use to the **Plaintiff**. Plaintiff incurred $250,000 direct expenses for attending the Fuqua School of Business. The actual damage in monetary terms of is much more than the actual cost of attending the Fuqua School of Business.

215.   By the aforementioned Student Defendants and Corporate Defendants' outrageous conduct, carelessness and reckless indifference to the rights of the **Plaintiff,** **Plaintiff** suffered a loss and damage. Therefore given that the Student Defendants and Corporate Defendants' conspiracy to interfere with civil rights of **Plaintiff** was the proximate cause of damage to the **Plaintiff**.

216.   Because**,** Student Defendants and Corporate Defendants' conspiracy to interfere with civil rights of **Plaintiff** was reckless disregard for the safety of the **Plaintiff**, punitive damages should be awarded against it in an amount to be determined at trial.

217.   WHEREFORE, **Plaintiff**, prays this Honorable Court for the entry of a judgment in **Plaintiff'** favor and against Student Defendants and Corporate Defendants in the sum not less than $250,000 (Two hundred and fifty thousand dollars) damages exclusive of Compensatory damages according to proof; Punitive damages; Exemplary damages; Interest as allowed by law; Costs of suit; and Such other and further relief as this court may deem just and proper and brings this action to recover the same.


DATED: March 10, 2010

*Vamsidhar Vurimindi*

**Vamsidhar Reddy Vurimindi , Plaintiff, Pro Se**

## VERIFICATION

I, Vamsidhar Reddy Vurimindi, am a **Plaintiff** in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Philadelphia, Pennsylvania.

DATED: March 10, 2010

**Vamsidhar Reddy Vurimindi , Plaintiff, Pro Se**